# CASES

# SUPREME JUDICIAL COURT

---

## HATHORNE *vs.* STINSON *& als.*

In the grant of a lot of land, it was bounded upon a certain pond — the water, at the time, being raised by artificial means above its natural level. Subsequently, on the obstructions being removed, and the consequent recession of the waters, two and a half acres, between the lines of the lot, became disencumbered and capable of tillage. *Held,* that the lot was not limited to the margin of the pond, as it was at the time of the grant, but that it embraced the two and a half acres.

A *license* to flow the land of another, is not to be presumed in favor of the mill owner, from an uninterrupted use by flowing for twenty years or more, where it appears that the owner of the land sustained *no damage* by such flowing.

A special Act of the Legislature, relieving mill owners from a statute obligation to keep a passage open for fish, four months in the year, was held not to affect their liability to the owners of land, for the increased injury to them by flowing.

THIS was a complaint against the defendants under the provisions of *stat.* of 1821, *ch.* 45, for flowing, by means of their dam, about two and a half acres of meadow, claimed by the plaintiff.

The defendants filed a brief statement, denying the plaintiff's seizin, and alleging their right to flow on various distinct grounds, such as a grant of the right to flow, from the common owners of lot No. 49 and of the defendant's mills — also a license.

The plaintiff proved his title to lot No. 49. The two and a half acres were a part of No. 49, if that extended to the margin of the waters of *Neguasset* pond, in its natural state. The location of this lot appeared on an ancient plan, which was used at

the trial, and by which the easterly end of the lot appeared to be
bounded by the pond.    There was evidence, tending to show
that there was a mill and dam on the *Neguasset* stream, as early
as 1730, which appeared to have been renewed from time to
time, up to the period when this complaint was made.    And
there was evidence, tending to show, that when the original sur-
vey and plan were made, and also when lot No. 49 was granted
by the Propriety, the two and a half acres were covered by the
waters of the pond.    Whereupon, the counsel for the defendants
requested the Chief Justice, who tried the cause, to instruct the
jury that the owner of No. 49 was restricted to the margin of
the water as it then existed, but he declined so to do, instructing
them that the plaintiff had proved his seizin in the land, alleged
to have been flowed.

It appeared that these two and a half acres were first brought
into cultivation about the year 1790 — prior to which time they
remained in a state of nature — overgrown with bushes and·
affording no profit.    The defendants' counsel requested the Judge
to instruct the jury, that if they should find that the dam com-
plained of was generally kept up to such a height, as to flow the
two and a half acres, from the year 1730 or 1760 to the year
1789, without any complaint on the part of the owners of lot 49,
it furnished a legal presumption that the owners of the dam had
a license thus to flow, and that such license was irrevocable.
But the Judge instructed the jury, that the land being in a state·
of nature and affording no profit, and the owners, therefore, sus-
taining no damage, their forbearing to complain or to pursue any
remedy against the owners of the dam, was no evidence that they
had licensed such owners thus to flow.

It appeared that lot No. 37, which was upon the eastern side
of the *Neguasset* stream, were drawn and granted on the same
day, and it was contended for the defendants, that 37 being ear-
lier in the series, must be taken to have been granted first, and
that it embraced the eastern side of the stream, where the dam
was, and therefore justified the flowing without the payment of
the damages ; but the Court ruled otherwise.

It appeared that in 1788, the legislature required, that from
*May* to *September,* a passage should be kept open in the dam for

fish, and there was evidence, tending to show that the productive value of the land in question, depended upon the state of things growing out of this regulation.   In 1828, by an act of the legislature, the owners of the dam were relieved from this obligation, whereupon the land became less productive.   And it was contended by the defendants' counsel, that they were not answerable for damage thus occasioned, but the Court ruled otherwise.

The defendants' counsel offered in evidence, to prove the existence of a mill or mills and a dam at *Neguasset, Hubbard's History of the Indian Wars,* and *Sullivan's History of Maine,* but they were rejected by the Court, as incompetent evidence of the existence of the mill or dam at the time therein stated.

A verdict was returned for the complainant, which was to stand, if the ruling of the presiding Judge was correct, and further proceedings had according to law ; otherwise it was to be set aside and a new trial granted.

*Allen* and *Sprague,* for the defendants.

1. At the time of the original grant of lot No. 49, and at the time of the making of the plan, the pond covered the two and a half acres, and they were therefore not granted.   That grant is not affected by the Ordinance of 1641.   Here was no high and low water mark, and that ordinance was intended to apply to tide waters only.   *Storer* v. *Freeman,* 6 *Mass.* 435.   The plaintiff could not claim this two and a half acres by the common law, on the ground of going to the thread of the stream.   That principle will not apply to ponds and lakes in this country, and it has never been so extended.

2. The keeping up of the dam from 1730 to 1789, was evidence of a *license.*   If it be said that there was no damage to the owner of the land, the reply is, that if the drawing off of the water would have rendered the land productive, the keeping it flowed was a damage, for which the plaintiffs might have complained.   Preventing it from becoming productive, was as much a damage as destroying it after it became so.

3. No. 37, where the mill is, was first granted.   Because the vote was first passed — and because earlier in the series.   Admitting they were both on the same day, still the votes operate

like deeds. If there were two deeds, and one was delivered before the other, it would vest rights which could not be impaired by the second deed. This is not like a case of a deed and mortgage, which as between the parties may be regarded as one transaction; but here were two grantees having no privity or connexion whatever.

4. The land having been productive by operation of the Fish Laws, and not by any labor of the plaintiff, he is not entitled to the benefit thus acquired, any longer than those laws continue. When those laws were repealed, both parties were restored to the same rights and privileges enjoyed when they were enacted. If the plaintiff could not have maintained a complaint in 1788, against the mill owners, for keeping the water up and thereby preventing the land from becoming productive, he cannot do so now, after it has become so. And he could not have complained in 1788, after a lapse of 58 years, during all which time he was deprived of the use of this land. The legal presumption is, that he would not have thus omitted to complain, or rather the owners of the lot, unless compelled to, either in consequence of having granted the right of flowing by deed or by license, the evidence which is now lost by lapse of time and accident.

*Bailey* and *Mitchell,* for the complainant, argued in opposition to the positions assumed on the other side, and cited the following authorities: *Graves* v. *Fisher,* 5 *Greenl.* 69; 5 *Wend.* 483; *Storer* v. *Freeman,* 6 *Mass.* 435; *Lapish* v. *Bangor Bank,* 8 *Greenl.* 85; 1 *Cranch,* 24; 2 *Cranch,* 67; 8 *Johns. R.* 94; 3 *Kent's Com.* 427.

The opinion of the Court, at a subsequent term, was delivered by

Parris J. — The law now arising in this case is to be applied to a very different state of facts from that which appeared in the case when before us in 1833. 1 *Fairf.* 224.

It is contended, that the complainant had no title to the land flowed, because that was covered with water, at the time of the conveyance from the common proprietors of the whole tract. We do not think the grant is to be thus limited. If the *Neguasset* pond was a large pond or lake, and had not been raised by

artificial causes, we might view this point differently. But even then much difficulty would result from the principle that all proprietors of land bordering on lakes are to be limited to the margin of the water, as it existed when the lands were originally granted by the public, perhaps a century ago ; and that whatever may have since been reclaimed by a recession of the water, is to be considered no part of the grant. We are not now called upon to decide such a case. *Neguasset* pond, as it is called, in its natural state, never covered any part of the two and a half acres, which the complainant claims as his property. That pond is naturally a small accumulation of water, of considerable length, but opposite lot numbered 49, is, in width not more than half the length of the lot, as delineated on *Johnson's* original plan, taken in 1740. We have no boundaries given of lot 49, except as they appear on the plan. By this the eastern end of the lot is represented as bounded on the pond. We think the eastern limits of the lot were not so restricted by the margin of the pond, as it then existed, raised as it was by artificial means, as to exclude the two and a half acres from the lot, — but that when the water receded in 1789, by reason of the removal of the artificial obstructions, the complainant had a right to the soil thus disencumbered, *as constituting a part of lot 49.*

In 1790, this tract of two and a half acres was brought under cultivation by the complainant, and he continued to occupy it, as a part of his farm, until 1828, a period of thirty-eight years, which, by our statute would be a bar to any action that could be brought to recover possession, either by the original proprietors or their heirs. Thus the first question raised in the case is disposed of.

The Judge was requested to charge the jury, that, "if they should find that the dam complained of was generally kept up to such a height as to flow the two and an half acres from 1730, or 1760 to 1789 without any complaint on the part of the owners of lot 49, it furnished a legal presumption that the owners of the dam had a license thus to flow." If the owner of lot 49 sustained any injury or damage by the flowing, perhaps the uninterrupted continuance of that injury for twenty years and upwards, by the mill owner, and an acquiescence by the owner of the land

flowed and injured for that length of time, might be considered as evidence of a license. Upon this point we give no opinion, but refer to our former remarks in this case, 1 *Fairf.* 239.

But if the owner of the land sustained no damage by the flowing, then his acquiescence ought not to be construed into an admission of right, or taken as evidence against him, either of grant or license. Generally, when one encroaches upon the inheritance of another, the law gives a right of action, and even if no actual damages are proved the action will be sustained, and nominal damages recovered; because, unless this could be done, the encroachments acquiesced in, might ripen into a legal right, and the trespasser, by a continuance of his encroachments, acquire a perfect title.

But in the case of flowing, the owner of the land flowed can maintain no process unless he has sustained damages in his lands by their being flowed. *Stat. Chap.* 45, *Sect.* 2. — In *Stowell v. Flagg*, 11 *Mass.* 364, the court say, " the process is given only to those who have actually suffered damage." In the same case it is decided, that by the statute of 1795, *chap.* 74, for the support and regulation of mills, of which our statute is substantially a transcript, the common law remedy by action for the owners of lands for damage done by overflowing the lands by means of a mill dam lawfully erected, is taken away, and the only remedy in such case is by complaint pursuant to the provisions of the statute. A statute providing for similar objects was passed by the Provincial Government in 1714. *Province Laws, Chap.* 111. The concluding paragraph of this statute, provides, " if the jury find no damage for the complainant, then he or they to be at the cost of the jury, as shall be allowed by the justices of said court."

If, therefore, the common law right to maintain an action against the mill owner for, flowing his neighbor's land, is taken away by the statute, and if the statute affords no remedy except in those cases where damages have been actually sustained, the continuing to flow under such circumstances ought not to prejudice the title of the owner of the land thus flowed. His hands are tied. He can neither resort to his action at common law, nor to process under the statute. The mill owner can flow in perfect security without license and free from all liability to legal

process; and so long as he can do this, no grant or license is to be presumed in his favor.

Such was the situation of the owner of this mill from the time of its first erection until the complainant " actually suffered damage." If he suffered no damage until 1789, he had nothing to complain of for which the law would afford him any remedy, and consequently, his omitting to complain subjects him to no legal disability.

It is entirely immaterial whether lot 37, or lot 49, was drawn first, as it is manifest from *Johnson's* plan of the original survey that lot 37, did not include the mill site.

But were it material, the book of records of the proprietors in common, shows conclusively that lot 49, was first drawn, and consequently the argument which was raised, and upon which we gave an opinion, in 1 *Fairf.* that the grant of a mill gave the right to flow the grantor's land, as flowed at the time of the grant, is not sustained by the facts. The facts show that the land flowed was first granted the grantor retaining the mill.

We do not perceive how the special Act of the Legislature of 1828, gave the mill owners any rights against the complainant. It relieved them from the obligation, under which they had been placed by the act of 1788 for public accommodation, but it clothed them with no rights against the owners of the land which they might overflow by reinstating their dam.

So far as it regarded private injuries the special law of 1828 had no operation. The complainant's land had then been under productive improvement for nearly forty years, and if the mill owners found it for their interest so to flow as to interrupt and destroy that improvement there is no principle either of law or equity which gives them the right of so doing, without paying the damages.

From the view which we have taken of this case, the rejection of *Hubbard's* History of the *Indian* wars, and *Sullivan's* History of Maine, offered as evidence of the existence of the mill and dam, becomes immaterial.

The verdict must stand and such further proceedings will be had in the case, as the statute provides.