BOARDMAN *v.* SCOTT.

1. Under a deed bounding the land therein conveyed by an artificial pond which had been in existence for more than forty years, and which had thus become a permanent body of water and was still being kept up and maintained as such, its waters however ebbing and flowing from time to time so as to leave a margin of land between its high and low water marks, the line of the land so conveyed did not extend to the thread of the stream from whose waters the pond was formed, but only to the low-water mark of the pond at the date of the execution of the deed.

2 In view of the evidence introduced at the trial, the court erred in adjudging, as matter of law, that the true boundary between the contending parties was the high-water mark of the pond as it existed on the 15th day of August, 1883.

3. The case should be tried again, in the light of the law as announced in the first headnote; and at the next hearing it can be investigated and determined whether or not, for any reason depending upon the particular facts as then made to appear, the high-water mark, rather than

the low-water mark, should be treated as the true dividing line between the possessions of the plaintiff and the defendant.

4. In no event, under the facts appearing in the record now before this court, can the plaintiff, as against the defendant, claim title to the additional land covered by water in consequence of the raising of the dam after the present litigation began.

Argued February 25, — Decided March 29, 1897.

Equitable petition. Before Judge Felton. Bibb superior court. April term, 1896.

*Hill, Harris & Birch,* for plaintiff in error.
*Dessau, Bartlett & Ellis,* contra.

FISH, J. This litigation arises out of a dispute between the proprietors of adjoining tracts of land over the boundary between their respective possessions. The land of the defendant Boardman is described in his deeds as being bounded on the south by "McCall's mill-pond." Under this description of his southern boundary, Boardman claims that his title extends to the center of the pond, through which he claims there flows a well-defined current. On the other hand, the plaintiff claims that Boardman's title extends only to the high-water mark of the pond. It is admitted by both parties that the plaintiff's ancestor, under whom both of them claim, had title to all the land adjacent to and covered by "McCall's mill-pond," as well that portion now owned by Boardman as that part owned by the plaintiff; that the title to all of said land is now in the plaintiff, except in so far as it was divested by the deed of Sarah McCall and E. J. Davis to Henry B. Davis, dated Aug. 15, 1883, conveying the land now owned by Boardman to Henry B. Davis, from whom Boardman derives his title, and that Boardman has title to all the land covered by said deed. The evidence shows that H. B. Davis conveyed the land covered by his deed to H. T. Powell, on Aug. 18, 1886, and on May 10, 1887, Powell made a deed to the same to Boardman, the defendant. Each of these three deeds purports to convey thirty acres of land, more or less, the southern boundary of which is described as being "McCall's mill-pond." According to the evidence, there is no perceptible current in the pond when the water is up, but when the water is down there is;

and the water on the edge of the pond rises and falls to the extent of whether the pond is full or low. The pond has been in existence since prior to 1840. The Central Railroad & Banking Co., in 1840, made a contract with the then owner of the pond, by which it agreed to keep up the dam of the pond, in consideration of a "right of way" across it; and during that year it built its track across the top of said dam, and it has been in possession of this "right of way" and track ever since. The dam washed away once and burst out once, and the railroad company restored it. Since the commencement of this litigation the plaintiff has raised the height of the dam one foot, which has caused a small amount of additional land to be overflowed. In the opinion of the only witness who testified on this subject, the whole amount of land submerged by reason of the raising of the pier-head was not over an acre.

1. The boundary question raised in this case is an interesting one, which is now for the first time before this court. Therefore, and because of the conflict of authorities, we shall not content ourselves with mere citation which might sustain our rulings, but will fully discuss the subject. It is well settled, both by the common law and the decisions of the courts of this country, that where land is bounded by a non-navigable stream the boundary extends to the center or thread of the stream. Such has ever been the law in this State. *Hendrick* v. *Cook*, 4 *Ga.* 255; *Jones* v. *Water Lot Co.*, 18 *Ga.* 539; *Stanford* v. *Mangin*, 30 *Ga.* 355; Civil Code, § 3058. While under the common law a navigable stream was one in which the tide ebbed and flowed, in this State it is a stream capable of bearing upon its bosom, either for the whole or part of the year, boats loaded with freight in the regular course of trade. Civil Code, § 3059. Whether, where land is described as being bounded by a natural lake or pond, the title of the grantee extends to the center of the pond or lake, is a question upon which the authorities, as we have said, are by no means harmonious, there being much respectable authority upon either side of it. But we think the decided weight of authority sustains the proposition, that where a deed bounds the premises therein conveyed by a natural lake or pond, the title of the grantee

does not extend beyond the low-water mark. Angell on Water-courses, 6th ed. § 41; 3 Washburn on Real Prop., 5th ed. 443; Gould on Waters, § 203; Devlin on Deeds, § 1026; 4 Am. & Eng. Enc. of Law, 2d ed. 832; 6 Lawson's Rights, Rem. & Prac. § 2908; Tyler's Law of Boundaries, 70; Waterman v. Johnson, 13 Pick. 261; West Roxbury v. Stoddard, 7 Allen, 167; Nelson v. Butterfield, 21 Me. 38; Jakeway v. Barrett, 38 Vt. 323; Hathorn v. Stinson, 12 Me. 183; Bradley v. Rice, 13 Me. 200; Wood v. Kelley, 30 Me. 47; Paine v. Woods, 108 Mass. 170; Boorman v. Sunnuchs, 42 Wis. 233; Diedrich v. Northwestern Ry. Co., Ib. 248; Trustees of Schools v. Schroll, 120 Ill. 509; Stevens v. King, 76 Me. 197; Manson v. Blake, 62 Me. 38; State v. Guilmartin, 9 N. H. 461; Delaplaine v. Chicago etc. Ry. Co., 42 Wis. 214; Seaman v. Smith, 24 Ill. 521; Noyes v. Collins, 92 Iowa, 566.

We think that this view is not only supported by the weight of authority, but also by sound reason. If the common-law rule which is applied to land bounded by a stream is applicable to land bounded by a lake or pond, then every lake or pond which is surrounded by separate tracts of land, belonging to different owners, some of which abut upon it at each end and some at each side, will have to be supplied with at least two imaginary threads of streams, which will intersect each other at right angles in the center of the body of water, and the side-lines projected into the water to find a *filum aquæ* for one proprietor will intersect the similar outgoing lines of another proprietor; and if there are several of such tracts at each end and several at each side, the side-lines of one proprietor may intersect those of several other proprietors, so that land under water may be included within the lines of two, three, or even more ostensible owners. Let us suppose, simply for the sake of easy illustration, that there is a natural lake or pond which is perfectly square, currentless, and the marginal lines of which run with the cardinal points of the compass. A. owns all the land which abuts upon the lake at the north, B. all that touches it at the south, and C. and D. respectively own all the land at the east and west sides of the same. The land of each of the four proprietors is described as being

bounded on one side by the lake. If the rule that we are discussing is to be applied to lakes and ponds, as to A. and B. the thread of the stream is an imaginary straight line running due east and west through the center of the lake; while as to C. and D. it is an imaginary straight line running exactly midway of the lake, north and south, and necessarily intersecting at right angles the *filum aquæ* made for the purpose of bounding the tracts of A. and B. Does A. own one half of the bed of the lake, to the exclusion of C. and D., or do the two latter, taken together, own all the land under the water, to the exclusion of the two former? We know that there is authority for holding that when an attempt to apply the common-law principle relative to streams to a lake or pond develops such complications, the land under the water should be divided ratably between the different shore-owners. Taking this view in the case put, a modification of the principle might be adopted by drawing two diagonal lines from the angles of the lake, intersecting each other at its central point, and holding that each of the four proprietors is entitled to the bed of the lake within the triangular space thus formed, immediately in front of his shore-line, and to no more. But it is evident that each proprietor would then be deprived of one half of the land covered by water to which he would be entitled under the application to his boundary alone of the rule *usque ad filum aquæ.* If, however, we gradually increase, upon each side of the lake, the number of shore-owners, it will be seen that the difficulty of adopting even a modification of the rule, which will be fair and just to all parties whose interests conflict with each other, will become greater and greater, soon becoming so great as to render it practically impossible to uphold, in any reasonable and sensible degree, in behalf of each proprietor, this principle which is so well adapted to streams and so ill adapted to lakes and ponds. Of course, it is not at all probable that any natural lake or pond is square; but no matter what the shape of the body of water may be, if there are several shore-owners at each of its sides, or if there be several at each end and several at each side, the difficulties in the way of a practical application of the principle under consideration will be

equally as great, if not greater than in the case supposed. In fact, owing to the irregular and more or less circular outlines of most lakes and ponds, in the great majority of cases the difficulties will be greater.

In State of Indiana v. Milk, 11 Fed. Rep. 389, Gresham, J., well and forcibly states the reasons why the common-law principle relative to land bounded by a stream is not applicable to land described as being bounded by a lake or pond. He says: "Non-navigable streams are usually narrow, and the lines of riparian owners can be extended into them at right angles, without interference or confusion, and without serious injustice to any one. It was therefore natural, when such streams were called for as boundaries, to hold that the real line between opposite shore-owners was the thread of the current. The rights of riparian proprietors in the bed of the stream, and in the stream itself, were thus clearly defined. But when this rule is attempted to be applied to lakes and ponds, practical difficulties are encountered. They have no current, and being more or less circular, it would hardly be possible to run the boundary lines beyond the water's edge, so as to define the rights of shore-owners in the beds. Beaver Lake is seven and a half miles east and west, and less than five miles north and south. Extending the side and end lines into the lake, there being no current, when would they meet? This rule is applicable, if at all, whether there be one or more proprietors. I do not think that the mere proprietorship of the surrounding lands will, in all cases, give ownership to the beds of non-navigable lakes and ponds, regardless of their size. It would be unfair and unjust to allow a party to claim and hold against his grantor the bed of a lake containing thousands of acres, solely on the ground that he had bought and paid for the small surrounding fractional tracts—the mere rim." We think it is very unreasonable to presume that one owning a large pond and all the land under and around its waters, who sells and conveys to another a small tract of the surrounding land, intends, by designating the pond as one of its boundaries, that his grantee shall take all the land beneath the water between the shore-line of the premises conveyed and the center of the pond. This

presumption is particularly unreasonable when the pond is, and has been for many years, probably ever since it came into existence, the reservoir which supplies the necessary power to operate a mill belonging to the grantor, located at its mouth. Surely, in such a case there is neither reason nor common sense in presuming that the grantor intended to convey to the grantee, in addition to the acreage named in the deed, part of the reservoir which is absolutely essential to the operation of his mill.

We are aware that the Supreme Court of the United States, in Hardin *v.* Jordan, 140 U. S. 371, a case which went up from the northern district of Illinois, in an elaborate and carefully prepared opinion, held that, "By the common law, under a grant of lands bounded on a lake or pond which is not tide-water and is not navigable, the grantee takes to the center of the lake or pond, ratably with other riparian proprietors if there be such"; and that this was the law of Illinois, "notwithstanding the opinion of its highest court in Trustees of Schools *v.* Schroll, 120 Ill. 509." Three of the Justices, however, dissented from this ruling, holding that "the question how far the title of a riparian owner extends is one of local law," and that the Supreme Court of the United States was bound by the decision of the Supreme Court of Illinois in Trustees of Schools *v.* Schroll, which Mr. Justice Brewer, who delivered the dissenting opinion, termed, "the distinct and well-considered, as it was also the unanimous decision of the highest court of the State." He further said: "We do not think it sufficient to overthrow the force of this decision, to say that the common law of England was different, a proposition which, in passing, we may say we doubt." We have carefully read and considered the opinion of the majority of the court in Hardin *v.* Jordan; and with all due deference to so high an authority, for which we have the greatest respect, we must say that we are not convinced that the common law was as therein stated. While the opinion shows that the case received a careful investigation and consideration, as, from the high character of the court which rendered it, one would naturally have presumed, no case decided by an English court

prior to the American Revolution is cited as authority upon this point. We therefore naturally conclude that no such case could be found. If there is such a case, we have been unable, with the resources at our command, to discover it. To sustain the proposition, that under the common law the rule as to land bounded by a lake or pond was the same as that applied to land bounded by a stream, the court cites and seems to lay great stress upon the case of Bristow v. Cormican, decided by the House of Lords in 1878, and reported in 3 App. Cas. 641. We shall presently endeavor to show that the establishment of this proposition was not necessary in order to reach the conclusion arrived at by the House of Lords in that case, and that, as we understand the case, the court did not pass upon it. Before citing and commenting upon that case, however, the able and learned Justice who delivered the opinion of the court in Hardin v. Jordan, supra, in attempting to demonstrate this proposition, says: "Lord Coke, however, when enumerating the different things that are comprehended under the term 'land' as a subject of ownership, mentions land covered with water. His words are: 'Also the waters that yield fish for food and sustenance of man are not by that name demandable in a *præcipe;* but the land whereupon the water *floweth* or *standeth* is demandable; as for example, *viginti acras terræ aqua coopertas*—twenty acres of land covered with water.' Co. Litt. 4 a. And after showing that the right of fishery may be granted by the owner distinct from the right of soil, he adds: 'If a man grant *aquam suam*, the soil shall not pass, but the fishery within the water passeth therewith.' But where a collection of water has acquired a specific name, he says that the land may be included under that name, as '*Stagnum*, a poole, doth consist of water and land, and therefore by the name of *stagnum* or poole the water and land shall pass also.' So of a gorse or gulf, for which a *præcipe* will lie with the esplees in taking of fish therefrom. Co. Litt. 5 b. This shows that still water as well as rivers and streams was subject to private ownership by the old English law." It seems to us that it shows something more than this. For if the *thing* designated by the specific name which has been acquired

by the collection of water consists of land and water, so that. when this name is used in a conveyance the land under the water is thereby included and described, it would seem that when a boundary is designated by this specific name, the land covered by the water would be included and designated as the boundary; and as no part of land described as a boundary passes as appurtenant to the land which it bounds, the boundary-line of the contiguous land would be at the water's edge. We may remark, in this connection, that it was decided in Jackson *v.* Halstead, 5 Cowen, 216, upon the authority of Lord Coke, that "A grant of a river, *eo nomine*, will not pass the soil of the river, or an island within it." The specific name which has been acquired by the collection of water now in question is, "McCall's mill-pond." Now, if one who owns the thing described by such specific name, that is the water and the land upon which it stands, conveys to another a tract of land contiguous to it and designates "McCall's mill-pond" as one of the boundaries of such contiguous tract, is not the land under the water as much designated as the boundary as the water? Does he not designate the whole thing, consisting of land and water and known as "McCall's mill-pond," as the boundary?

In the further discussion of the subject, the learned Justice cites the case of Bristow *v.* Cormican, supra, as being "directly in point," and of which he says: "Of course this decision has not the controlling authority which it would have if it had been made prior to our Revolution. But it is the judicial decision of the highest authority in the British empire, and is entitled to the greatest consideration on questions like this, of pure common law." Undoubtedly the decision of the highest court of the British empire, on a question of pure common law, is entitled to great consideration in this country, even though, by reason of its having been rendered since the American Revolution, it is not to be considered here as a controlling precedent. upon the question involved. But, as we have said, we do not think that the precise question which we are considering was passed upon by the House of Lords in that case. There the plaintiffs "brought trespass against the respondents to assert a several fishery in Lough Neagh. The plaint contained three.

counts: (1) Trespass on the plaintiffs' several fishery in Lough Neagh at a place called Feumore. (2) Trespass on the plaintiffs' land covered with water at Feumore being a part of Lough Neagh. (3) Conversion of the plaintiffs' fish. The defendants pleaded a general denial of the alleged trespasses; a denial of the plaintiffs' property in the several fishery, lands, and goods; a denial that there was a several fishery in Lough Neagh; and, as a special defense to the first two counts, they alleged that the several fishery and the lands covered with water were, and from time immemorial had been, part of an inland sea called Lough Neagh; and at the time when, &c., the said inland sea had been a common or public navigable inland sea, and that in the part thereof mentioned every subject of the realm had, and of right ought to have, the right and privilege of fishing, and that in the exercise of that right the defendants committed the trespasses in said counts mentioned. The plaintiffs by their replication took issue on the allegations of fact, and also averred that the tides of the sea had never flowed in Lough Neagh, and that the fishery in the first count mentioned, and that the place in the second count mentioned, had been put in defense, and was an ancient possession of the Crown, and had been granted by the Crown to the Earl of Donegall, through whom the plaintiffs claimed. The defendants demurred to this replication, and joined issue on the other pleadings. The demurrer was overruled." We have quoted thus fully from the statement of the case by the reporter, to show that no question as to the rights of riparian proprietors in the bed of the lake was made. The question whether the Crown has a de jure right to the soil or fisheries of an inland, non-tidal lake was squarely made, and was decided in the negative. This was the main and controlling question in the case, as the plaintiffs relied upon a grant from the Crown, without showing prior possession in the Crown. The defendants, as will be seen, did not set up any riparian rights in themselves, nor claim under the riparian rights of anybody else. They claimed that "every subject of the realm had, and of right ought to have, the right and privilege of fishing" in Lough Neagh, "in the part thereof mentioned." Such a claim was necessarily antagonistic to the

idea that any riparian rights in reference to the matters in controversy existed. While the court did not pass upon this claim of the defendants, as it did not become necessary to do so, neither did it decide any question arising out of riparian ownership on Lough Neagh. Certainly Lord Blackburn, who delivered an able opinion in the case, could not have thought that such a question was involved in the case, or he would not have used the language in that opinion which we shall presently quote. In discussing some remarks of Mr. Justice Wightman, in Marshall *v.* Ulleswater Steam Navigation Co., 3 B. & S. 742, he says: "This is the only case cited, and as far as I can find the only case which exists, where there is even a suggestion that the Crown, of common right, is entitled to the soil of lakes. Neither the passage in Comyns, nor that in Hale *de Jure Maris,* cited by Mr. Justice Wightman, gives any countenance to such a doctrine. But it does appear that that learned judge did not think that the law as to land covered by still water was so clearly settled to be the same as the law as to running water, as to justify him in unnecessarily deciding it was the same. More than this I think does not appear from that case. I own myself to be unable to see any reason why the law should not be the same, *at least where the lake is so small, or the adjoining manor so large, that the whole lake is included in one property.  Whether the rule that each adjoining proprietor, where there are several, is entitled usque ad filum aquæ, should apply to a lake, is a different question.* It does not seem very convenient that each proprietor of a few acres fronting on Lough Neagh should have a piece of the soil of the lough many miles in length tacked on to his frontage. *But no question arises in this case as to the rights of the riparian proprietors amongst themselves, for no title is made by either party through any one as riparian owner.*" (The italics in this quotation are ours.)

A case much more in point is that of Johnson *v.* Bloomfield, Ir. R. 8 C. L. 68, which the Supreme Court of Ohio, in Lembeck *v.* Nye, 47 Ohio St. 336, in discussing the rule with reference to land bounded by non-navigable lakes, cites as authority for the statement that "In England the rule is to limit the

operation of the conveyance to the water's edge." And it is to be observed that this statement as to the law in England is made by a court which itself took the opposite view. In the case of Johnson *v.* Bloomfield, *supra*, the first headnote is: "King James 1—being seized of the lands of Rossmore and other lands adjacent to Lough Earne (2), (which is a large, navigable, enclosed water in which the tide does not flow or reflow—and of the whole soil and bed of the lake—did by Letters Patent grant the said lands and also certain islands, named, in Lough Earne, and also all other islands in Lough Earne being parcel of the said lands or any of them, and also a free fishery in the lake or waters of Lough Earne, and all waters, water-courses, fisheries, fishings, etc., lying and being in or within the same:—*Held*, that the soil of Lough Earne covered with water adjacent to the lands did not pass to the grantee to the middle thread of the lake." Whitesides, C. J., said: "In the decision of the case before us, the determination of three very important questions is involved; first, whether the soil passes by a deed granting a several fishery; secondly, as to the distinction (if any) between *liberia piscaria* and *separalis piscaria;* and thirdly, whether the law as to riparian ownership in streams applies to the case of great inland lakes, such as Lough Earne." In reference to the third question, he said: "We are required by the pleadings of the plaintiff to give him eight miles of land covered with water. Where is the grant of these lands? Lord Coke says such should be conveyed by the words '*terra aqua cooperata.*' Where are such lands to be found on this grant? Nowhere. Certain lands described are given to the grantee—certain islands by name, and others parcels of the premises; but the lands covered with water are not granted nor intended to be granted. Is the Crown, the grantor, excluded by this grant from the fishery or from the bed and soil of the lake; and if so, by what means? The case of Allen *v.* Donnelly (5 Ir. Ch. R. 229) shows that the Crown knew when and how to grant the ground and soil of a lough or lake, because it has in the grant to the Society for the Plantation of Ulster granted 'the whole water, bay, river stream, or rivulet of Lough Foyle, within the limits

aforesaid, and the whole ground and soil thereof, and also the whole piscary,' etc." Further on he said: "The bold doctrine that, without any words to pass this property, it has passed from the Crown, can not be maintained. The law as to riparian ownership of the banks of a river or stream flowing between the estates of adjoining proprietors can not here dispense with a grant of the land covered with water. On the whole case, therefore, I am of opinion that the words of the patent are perfectly clear, and there is nothing in it to give the patentee the bed and soil; and I am not prepared to extend the presumption that the bed and soil of a stream belongs to the riparian proprietors *ad medium filum aquæ*, to a large inland lake like Lough Earne." Pigot, C. B., concurred in the opinion of the Chief Justice. O'Brien, J., concurred in the judgment; and with reference to an illustration used by Lord Coleridge in Lord *v.* Commissioners of Sydney, 12 Moore, P. C. C. 473, that, "If land granted were described as bounded by a highway, it would be absurd to suppose that the grantor had reserved to himself the right of the soil *ad medium filum*, in the far greater majority of cases wholly unprofitable," he said: "This does not apply to the case before us, as, from the size of Lough Earne, so well adapted for general navigation and used by the public for that purpose, there is no absurdity in supposing that the Crown, in granting all lands lying along the lake, should have reserved the soil of the lake, but, on the contrary, various reasons may be suggested why it would be advisable to reserve it." Fitzgerald, B., did not decide this point, thinking that the case could be ruled without doing so, and Fitzgerald, J., and Deasy, B., concurred in his opinion. This is the only case, so far as we have been able to find, where the question, whether the common-law rule with reference to streams should be applied to lakes, has been before a court in Great Britain; and, as we have seen, the judges who considered and decided it were of opinion that it should not.

The rulings of those of our American State courts, which have held that the grantee of land described as being bounded by a lake or pond takes title to the center of the water, have not been reached by following any like rulings made by the

English courts, but by applying to such a case the well-established common-law principle in reference to land described as being bounded by a stream, upon the idea that the analogy between the two cases is such as to make the same rule applicable to both. The fact that there is, when the water is low, a perceptible current in the pond, leads us to remark that we think that there has been, in some cases, too much stress laid upon the mere presence of some current, however slight, or upon the fact that there is absolutely no current whatever. It was well said by Shope, J., in Trustees of Schools, supra, that "The riparian proprietor claiming to the thread or middle of the stream must show the bordering water *to be a stream*, and that his ground, in terms of legal effect, is bounded upon or along such stream,—that the stream is made the boundary. And while it is obvious that a currentless body of water can not be a stream, the fact of some current in a body of water is not of itself, in every instance, sufficient to determine its character as a stream, as distinguished from a pond or lake. The presence of some current is not enough, alone, to work an essential change in so essentially different things as a stream and a lake; for a current from a higher to a lower level does not necessarily make that a stream or river which would otherwise be a lake; nor the swelling out of a stream into broad water-sheets does not necessarily make that a lake which would otherwise be a river."

We believe that the question should be viewed rather from a practical, common-sense standpoint than from a purely technical one; and that if the prominent, tangible characteristics of the thing named as a boundary, taken as a whole, are those of a lake or pond and not those of a stream, and it is commonly known and designated as a certain lake or pond, and it has been in existence in this condition long enough to have become what may be termed a permanent body of water with well-defined boundaries, the law applicable to lakes and ponds should be applied to it, even though there may be some evidence of a current in it. We can readily see how a little stream, by means of a dam placed across its current, checking its onward flow and causing its accumulated waters to spread out above the

dam into a large still pond, covering a vastly greater space than that previously occupied by the stream at that point, may, during a sufficiently long period of time, during which the pond is maintained, with well-defined boundaries, completely lose its separate identity as a stream at that particular place, its identity as such having become swallowed up and obliterated by the large expanse of dead water which is known and designated, by a definite name, as a particular pond. In such a case, when one owning the pond and the lands surrounding it grants to another a tract of land and makes *the pond* one of its boundaries, the most natural presumption is that he means what he says, that *the pond*, and not the little *stream* flowing into it, shall be the boundary. If he intends the stream to be the boundary, it would seem natural for him to name *the stream* as such.

It is true that courts which have refused to apply the principle *usque ad filum aquæ* to natural lakes and ponds have held that it is applicable to those that are artificial. We apprehend that this distinction is based upon the presumption that the natural ones are permanent, while the artificial ones are but of a temporary character. This is correct as a general rule, and the presumption upon which it is based is good as a prima facie one; but every natural lake or pond is not permanent, nor is every artificial one necessarily of a purely temporary character. It was said, in a leading case, that "Where an artificial pond is raised by a dam, swelling a stream over its banks, it would be natural to presume that a grant of land bounding upon such a pond would extend to the thread of the stream upon which it is raised, unless the pond had been so long kept up as to become permanent, and to have acquired another well-defined boundary." Waterman v. Johnson, 13 Pick. 265. In Wood v. Kelley, supra, it was held, that where a conveyance bounded land upon a fresh-water pond which had been *permanently* enlarged by means of a dam at its mouth, the title extended to the low-water mark of the pond in its enlarged state. In the case at bar, it is not clear from the evidence in the record whether there is a stream flowing from a higher level into the pond, or whether it is simply fed by springs arising in its

bed, or located at its head. But, however this may be, the evidence shows that "McCall's mill-pond" had been in existence, and kept up as such, for more than forty years prior to the execution of the first deed to the Boardman tract, which describes its southern boundary as being this pond. During all of this time, with but temporary interruptions on two occasions, the dam at its mouth had been a part of the road-bed of one of the oldest and most important railway-lines in the State, which was, and is, under a contract to keep it in good repair, thus ensuring its stability and permanency. It had existed for more than twice the length of time required to acquire title to real estate by bare possession alone. It had been there long enough for a generation to come upon the scene of human action, play its part, and be succeeded by another, which was well advanced in its own career. Surely this pond had existed long enough to have become a well-known landmark in the neighborhood, long enough to be considered a permanent body of water, and to have acquired as well-defined and well-known boundaries as most natural lakes or ponds. Under these circumstances, we think the rule is the same as that applied to natural lakes and ponds. See 4 Am. & Eng. Enc. L. 2d ed. 837; Gould on Waters, § 203, where the principle above quoted from Waterman v. Johnson is recognized.

2. One of the assignments of error is, that "The court erred in holding and deciding as matter of law, upon the deeds admitted and the facts agreed on, that the defendant John L. Boardman had no right or title in and to said pond nor the land thereunder, nor any right of easement or fishery, boating, or user therein when raised to the full capacity allowed by the height of dam as said dam existed at the time of the conveyance to H. B. Davis." This assignment of error is good, because when the pond was "raised to the full capacity allowed by the height of the dam," it was necessarily at its high-water mark, while the true boundary-line, under the description in the deed to H. B. Davis, according to the weight of authority, is the low-water mark of the pond. See authorities upon this subject cited supra, and Austin v. Rutland R. R. Co., 45 Vt. 215; Wheeler v. Spinola, 54 N. Y. 376; Champlain

& St. L. R. R. Co. v. Valentine, 19 Barb. 484. The reasons for holding the low-water mark, instead of the high-water mark, or the margin of the pond at the precise time of the conveyance, to be the boundary, when a fresh-water pond is named as the boundary, are thus stated by Shepley, J., in Wood v. Kelley, supra: "The use of the waters of such ponds at all seasons of the year is of great importance to the owners of adjoining lands. When the water is low, its use becomes more desirable and valuable. . . Unless rebutted by some proof, the presumption is that it was the intention of the parties to a conveyance of land bounded by a pond, that the land should be bounded upon it at all seasons of the year, and not while the pond remained only at the level existing at the time of the conveyance." And Shaw, C. J., in Waterman v. Johnson, supra, says: "A large natural pond may have a definite low-water line; and then it would seem to be the most natural construction and the one which would be most likely to carry into effect the intent of the parties, to hold that land bounded upon such a pond extended to the low-water line, it being presumed that it is intended to give the grantee the benefit of the water, whatever it may be, which he could not have upon any other construction." In the case of Handley's Lessee v. Anthony, 5 Wheat. 374, it was decided that the State of Virginia, when she ceded to the United States the territory northwest of the Ohio river, retained the entire bed of the river, and yet that land on the northwest side of the river was bounded by the low-water mark. And Marshall, C. J., said: "Wherever the river is a boundary between two States, it is the main, permanent river, which constitutes the boundary; and the mind will find itself embarrassed by insurmountable difficulty in attempting to draw any other line than low-water mark."

As the defendant in error has raised the dam somewhat since this litigation began, we will say that, under the description in the deeds, Boardman's land extends to the low-water mark of the pond as it existed before this was done.

3. Counsel for defendant in error contends that, irrespective of the proper legal construction to be given to the description of the boundary in the deeds, "the edge of the pond" has been

"recognized, admitted, and acquiesced in" by each of the several owners of the Boardman lot as the true boundary. The expression, "edge of the pond," is indefinite; it may mean the margin of the pond at high-water, at low-water, or at an intermediate stage of the water. If the intention be to claim that the high-water mark has been fixed by acquiescence as the true dividing line between the lands of the contending parties in this case, we do not think it is sustained by the evidence. As we have seen, under the description in Boardman's deeds, the boundary of his land on the south is the low-water mark of the pond. The evidence contained in the record does not show that this boundary has been changed by acquiescence. Section 3247 of the Civil Code provides that "Acquiescence for seven years, by acts or declarations of adjoining landowners, shall establish a dividing line." We could easily demonstrate, by analyzing and discussing the evidence bearing upon this point, that no dividing line has been established in this way; but, as the case is to be tried again, when other evidence may be introduced, we do not deem it either necessary or profitable to do so. The case should be tried again, in the light of the law as announced in the first headnote; and at the next hearing it can be investigated and determined whether or not, for any reason depending upon the particular facts as then made to appear, the high-water mark, rather than the low-water mark, should be treated as the true dividing line between the possessions of the plaintiff and the defendant.

4. The court below rightly held that the plaintiff was not entitled to the additional land covered by water in consequence of the raising of the dam after the present litigation began; for in no event, under the facts appearing in the record now before this court, could the plaintiff as against the defendant claim title to this land.

*Judgment reversed.   All the Justices concurring.*