*R. J. Bacon* and *R. H. Ferrell,* contra.

---

STATE OF GEORGIA *v.* GEORGIA RAILWAY AND POWER COMPANY.

1. The acts of 1818 and 1819 (Prince's Digest, 297, 306), laying out the counties of Habersham and Rabun, contemplated that the entire territory organized into these counties was to be surveyed into lots, to be distributed by lottery or sold as provided in these acts, and grants were to be issued in pursuance of the plan of allotment and sale.
2. Where a grant refers to a plat as furnishing the description of the land conveyed, the plat itself and the words and marks on it are as much a part of the grant, and control so far as limits as concerned, as if such descriptive features were written out on the face of the grant itself.
(*a*) Where such a plat calls for a non-navigable river as a boundary, the line is to determine at it, and the land embraced in the grant will extend to the middle thread of the stream.
3. The case was fairly tried, and no substantial error of law prejudicial to the losing party is made to appear. The verdict is supported by the evidence and approved by the trial judge, and will not be disturbed.

DECEMBER 13, 1913.

Complaint for land. Before Judge Jones. Rabun superior court. July 5, 1913.

*T. S. Felder, attorney-general, R. C. Ellis, Watkins & Latimer, J. H. Felker, H. S. White, W. R. Little, C. G. Reynolds,* and *W. S. Paris,* for plaintiff.

*King & Spalding* and *Underwood, Rosser & Brandon, C. T. & L. C. Hopkins,* and *H. H. Dean,* for defendant.

EVANS, P. J. The State of Georgia brought an action against the Georgia Railway and Power Company to recover 258.4 acres of land, located within a deep gorge, through which the Tallulah river

runs, falling over several steep precipices during its course down the gorge. The locus in quo is described as being a single body of land lying within the counties of Rabun and Habersham, bisected by the dividing line of these counties, and "contained within the gorge on each side of the Tallulah river, lying between fractional lots Nos. 11 and 12 in the 4th district of Rabun county, and No. 11 in the 5th district of Rabun county, on one side of said gorge, and fractional lots Nos. 193, 182, and 183 in the 13th district of Habersham county, and Nos. 184 and 175 in originally the 13th district of Habersham but now in Rabun county, on the other side of said gorge," as is shown in an attached plat. The land is alleged never to have been surveyed, granted, or sold by the State, and to be a part of the public domain. The defendant denied so much of the petition as asserted title to the land to be in the State, and averred that no such strip of unsurveyed, ungranted, and unsold land existed. The trial terminated in a verdict for the defendant, and a new trial was refused the State. The paramount issue was whether the locus in quo had ever been granted by the State. The defendant contended in its plea that the boundaries of the different land lots, alleged in the petition to be on the respective sides of the gorge, extended to the middle thread of the stream of the Tallulah river, and that the State's grants of these land lots conveyed the land to the middle thread of the river. On the other hand the State contended that the grants stopped at the gorge, and did not include any land within the gorge. The defendant is the successor in title to the grantees of the several land lots referred to in the petition as boundaries of the locus in quo.

1. We will first inquire whether the legislation authorizing the sale and grant of land within the counties of Habersham and Rabun contemplated the reservation of any land from the general scheme to dispose of that territory. By an act of the General Assembly passed December 15, 1818 (Prince's Digest, 297), a large area of the State's unorganized territory was formed into counties. The lower territory was divided into three counties, including Early, and the upper territory was formed into four counties: Walton, Gwinnett, Hall, and Habersham. After defining the territory to be embraced respectively within the limits of Walton, Gwinnett, and Hall, the act declared that the balance of the territory shall form the county of Habersham, which "shall be divided

into thirteen districts, as equally as conveniently can be, by running lines parallel with the lines dividing the county of Walton and Gwinnett, and others crossing them at right angles, and subdivided into tracts of fifty chains, containing 250 acres each, by lines running as prescribed for subdividing the county of Early." The subdivision of land districts in Early county was required to be into squares of fifty chains, containing 250 acres. Parts of tracts which were bounded by watercourses containing one hundred and sixty acres and less were designated fractional lots, and disposed of as such. The surveyor-general was required to appoint fit and proper persons to run and plainly mark the several county and district lines in the above counties. In making the surveys, it was declared to be the duty of the surveyors to mark plainly and distinctly, on trees if practicable, all lines required to be run; to measure the lines with all possible exactness; to take as accurately as possible the meanders of all watercourses which should form natural boundaries to any of the surveys, to note in field books, to be kept by them respectively, the names of the corner and other station trees which should be marked and numbered, transcripts from which were to be deposited in the surveyor-general's office; to make a return of the map of the district, correctly delineating all surveys, and also a return of detached plats of each lot, from which a copy should be made to be annexed to grants. The act further provided for the distribution of all lots, except fractional lots, by lottery, and for the sale of the fractional lots. In 1819 (Prince's Digest, 306) this act was amended by organizing other territory, on the other side of the Tallulah river, into the county of Rabun; and all the provisions of the first act were made applicable to the survey of the new county, and it was provided that all lots which contained less than one hundred and sixty acres and lying on the Chattahoochee, the Chestatee, the Chatauga and the Terrura (Tallulah) rivers should be considered fractional lots and disposed of accordingly. From this summary of the acts organizing the counties of Habersham and Rabun it is apparent that the legislative purpose was to have the whole territory of the two counties laid off into land districts, and subdivided into lots for the purpose of distribution by lottery of all lots save the fractional lots, which were to be sold and the money turned into the State treasury.

2. Being of the opinion that the legislative intent was to have the entire territory of the counties surveyed and platted preparatory to issuing grants to the various land lots, we will next examine the grants issued by the State to the land lots referred to in the petition as adjoining the locus in quo, and contended by the defendant to include the locus in quo. One grant will serve as an illustration of all, and lot 11 in the 5th district of Rabun county is selected. The grant is to "all that tract or lot of land, containing one hundred and thirty seven and 5/10 acres, situate, lying, and being in the fifth district of Rabun county, in said State, which said tract of land is known and distinguished in the plan of said district by the number eleven (11), having such shape, form, and marks as appear by a plat of the same hereunto annexed. To have and to hold the said tract of land together with all and singular the rights, members, and appurtenances thereof whatsoever." The attached plat shows that lot number 10 touches the premises on the north, the district line on the east, the Terrura (Tallulah) river on the south, and lot number 12 on the west. At the point of contact with the river a spanish oak and a red oak tree respectively are delineated as marked trees, and the number of acres is stated as 137.5. No contention is made that this or any other plat is in any wise variant from the official map of the whole county, required under the acts of 1818 and 1819 to be filed in the office of the surveyor-general. The calls in the grant being referable solely to the plat, the calls of the plat become the calls of the grant, one of which is for the Tallulah river as a boundary. Where a deed or grant refers to a plat as furnishing the description of the land conveyed, the plat itself and the words and marks on it are as much a part of the grant or deed, and control so far as limits are concerned, as if such descriptive features were written out on the face of the deed or grant itself. Cragin *v.* Powell, 128 U. S. 691 (9 Sup. Ct. 203, 32 L. ed. 566) ; *Schreck* v. *Blun,* 131 *Ga.* 489 (62 S. E. 705) ; *Thompson* v. *Hill,* 137 *Ga.* 308 (73 S. E. 640) ; *Aiken* v. *Wallace,* 134 *Ga.* 873 (68 S. E. 937). "Whenever a natural boundary is called for in a grant or deed, the line is to determine at it, however wide of the course called for it may be, or however short or beyond the distance specified." *Riley* v. *Griffin,* 16 *Ga.* 141, 147 (60 Am. D. 726). It is admitted that the Tallulah river is nonnavigable; and our statute declares that where land is bounded by

a non-navigable stream, the boundary extends to the center or thread of the stream. Civil Code (1910), § 3630. Independently of the statute "such ever has been the law in this State." *Jones* v. *Water Lot Company*, 18 *Ga.* 539; *Boardman* v. *Scott*, 102 *Ga.* 404 (30 S. E. 982, 51 L. R. A. 178). A grant by the State, referring to an attached plat as furnishing a description of the land conveyed, which gives a non-navigable river as a boundary of the land granted, will be construed to extend to the middle of the stream given as the boundary. Giving this construction to the grants from which the defendant deraigns its title, they extend to the middle of the river, and there is no ungranted land left in the gorge which is the subject-matter of this suit.

It was insisted at the trial that even if the grants from the State be construed to cover the land in the gorge, they are limited as a conveyance of title to the land actually surveyed, which was only to the brink of the chasm and not to the river in the chasm. The field notes of the Rabun lots were found in the office of the Secretary of State, and were received in evidence. The notes did not contradict the plat. The field notes of the Habersham land could not be found. On a recent resurvey of the lots some of the marked trees noted in the field notes could not be found, and there was some variation in the length of the lines running to the river. These variations were not extensive. The engineer who made the resurvey for the State in 1912 testified: "In going over the work of these old surveyors, I was impressed that they made an honest effort to carry out the instructions under which they were working. There are some errors, as would be expected in surveying through a virgin territory like this was at the time they surveyed it, and of such rough topography; and I was impressed with the fact that their work had been done conscientiously, and with what at that time would have been called excellent accuracy." It is generally recognized that course and distance, depending for their correctness on a great variety of circumstances, are constantly liable to be incorrect. As was said by Chief Justice Marshall: "It is a general principle that the course and distance must yield to natural objects called for in the patent. All lands are supposed to be actually surveyed, and the intention of the grant is to convey the land, according to that actual survey; consequently if marked trees and marked corners be found, conformable to the calls of the

patent, or if watercourses be called for in the patent, or mountains or any other natural objects, distances must be lengthened or shortened and courses varied, so as to conform to those objects." McIver v. Walker, 9 Cranch, 173, 178 (3 L. ed. 694). The principle stated by the great Chief Justice is fully recognized by this court. *Riley* v. *Griffin,* supra; *Ford* v. *Williams,* 73 *Ga.* 106.

3. The State in this action is not attacking the validity of any of its grants. Nor is there any ambiguity in description of the land granted. The grants referred to the accompanying plats for a description of the land conveyed, and these plats gave the Tallulah river as a boundary; so that there is no conflict between the grant and the plat. The State granted land which it had ordered to be surveyed into lots for distribution and sale. Its surveyors reported the surveys and furnished plats of the same, and it is to be presumed that they discharged their duty. The State issued grants based on these plats. No irregularity is shown either in the surveys or the grants, and the State is bound by the grant, for which it received a consideration, as having conveyed the land therein described. We have carefully examined the record, and we do not think any substantial error prejudicial to the State was committed at the trial.

*Judgment on main bill of exceptions affirmed. Cross-bill dismissed. All the Justices concur.*