## UNITED STATES v. OREGON.

No. 13, original.   Argued March 12, 1935.—Decided April 1, 1935.

2

*Solicitor General Biggs,* with whom *Messrs. David E. Hudson, Aubrey Lawrence, H. Brian Holland, Lee A. Jackson,* and *Benjamin Catchings* were on the brief, for the United States.

*Mr. L. A. Liljeqvist,* Assistant Attorney General of Oregon, with whom *Mr. I. H. Van Winkle,* Attorney General, was on the brief, for defendant.

4

MR. JUSTICE STONE delivered the opinion of the Court.

This is an original suit brought by the United States against the State of Oregon to quiet title to 81,786 acres of unsurveyed lands in Harney County, Oregon. The lands lie within a meander line 105.36 miles in length. The line was surveyed principally by John H. Neal in 1895–1896, and approved by the Commissioner of the Land Office in 1897; the remainder has since been surveyed, and has been approved by the Commissioner. The meander line purports to mark the boundaries of lands underlying five bodies of water at the ordinary or mean high water mark. They are Lake Malheur (47,670 acres), Mud Lake (1,466 acres), Harney Lake (29,562 acres), the Narrows (296 acres, connecting Lake Malheur with Mud Lake), and the Sand Reef (2,792 acres, connecting Mud Lake with Harney Lake). The five bodies of water extend from the extreme end of Lake Malheur on the east to the westerly side of Harney Lake, a distance of approximately thirty miles. Lake Malheur is shown by maps in evidence to be 16.66 miles in length and more than 6 miles in width. Mud Lake is a small body of water, a little over a mile in diameter. Harney Lake is similarly shown to be 8.57 miles long and approximately 5 miles wide.

6

The principal source of inflow to Lake Malheur, at all the times material to the present controversy, has been from the Silvies River on the north and the Donner und Blitzen River on the south. The source of inflow to Harney Lake is from Lake Malheur through the Narrows, thence through Mud Lake and the Sand Reef. Some water also flows into Harney Lake on the north from Silver Creek, a mountain stream which is dry for part of the year. Harney Lake has no outlet.

By Executive Order of August 18, 1908, all of the land claimed by the United States in this suit was set apart as a bird reserve, known as the Lake Malheur Reservation, and has since been administered as such by the United States Bureau of Biological Survey, under the direction of the Department of Agriculture.

The State of Oregon was admitted to the Union on February 14, 1859. At that date the area within the meander line was a part of the public domain of the United States. No part of it has ever been disposed of, in terms, by any grant of the United States. Decision of the principal issues raised by the pleadings and proof turns on the question whether the area involved underlay navigable waters at the time of the admission of Oregon to statehood. If the waters were navigable in fact, title passed to the State upon her admission to the Union. *Shively* v. *Bowlby,* 152 U. S. 1, 26–31; *Scott* v. *Lattig,* 227 U. S. 229, 242, 243; *Oklahoma* v. *Texas,* 258 U. S. 574, 583, 591; *United States* v. *Utah,* 283 U. S. 64, 75. If the waters were non-navigable, our decision must then turn on the question whether the title of the United States to the lands in question, or part of them, has passed to the State. This is asserted to be a consequence of the United States having parted with title to the uplands bordering on the meander line, by patents to private grantees, and by statutory grant to the State of school and indemnity lands in the act admitting Oregon to statehood, see *United States* v. *Morrison,* 240 U. S. 192. The State contends

that the common-law rule, applied by this Court in *Hardin* v. *Jordan,* 140 U. S. 371, that a conveyance of land bounded upon the waters of a non-navigable lake carries by implication to the center of the lake, does not obtain in Oregon, especially in the case of lakes of the size of Malheur and Harney. It insists that grants by the United States of lands within the State, like those of a private individual, are to be construed in accordance with state law, and that by the common and statute law of Oregon a conveyance of the uplands bordering on a non-navigable lake, by the owner of the lake bed to any grantee, vests title to the bed in the State. Other questions of minor importance will be considered as it is found necessary to deal with them in the course of the opinion.

The issues raised by the pleadings were referred to a special master, with the powers of a master in chancery, to take the evidence and report his findings of fact and conclusions of law, and to make recommendations to this Court for a decree. After hearing and considering voluminous testimony he has rendered his report, with findings of fact and conclusions of law and a proposed form of decree. He found that none of the waters within the meander line was navigable in fact and concluded that the State of Oregon had acquired no right, title or interest in any part of the land lying within the meander line, save such as is incidental to the ownership of land acquired by it from patentees of the United States, fronting a distance of 159.67 chains on the meander line on either side of the westerly portion of the Narrows, designated on maps in evidence as Subdivision B (between the bridge and Mud Lake), and such as is incidental to its ownership of uplands acquired from grantees of the United States by patents bounding the granted lands upon the meander line fronting on the easterly side of Mud Lake, a distance of 72.31 chains. See *Hardin* v. *Jordan, supra.*

With reference to the land within the meander boundaries of Subdivision B of the Narrows, he found that the

United States, prior to the commencement of suit, had disposed of all its interest in the uplands bordering on the meander line on both sides, to patentees and as indemnity lands under the school land grant to Oregon. He also found that the Narrows had the character of a non-navigable stream, and concluded that the United States had retained no interest in the land within the meander line boundary, since R. S. § 2476, applicable to grants of the United States, provides: ". . . in all cases where the opposite banks of any streams not navigable belong to different persons, the stream and the bed thereof shall become common to both."

The Master accordingly recommended a decree adjudging that the State is owner in fee simple of the land lying within the meander line of Subdivision B of the Narrows, incidental to its ownership of patented uplands bordering on the meander line, and to a portion of the bed of Mud Lake fronting the riparian or littoral patented land of the State on Mud Lake, aggregating 8.99% of the total lake bed. The percentage was derived by determining the proportion which the length of the State's boundary on the meander line bears to the total meander line of the lake. It was further recommended that the State be adjudged to have no other right, title or interest in any of the lands in suit.

He also made the following findings which have a bearing on the title of the United States to land within the meander line boundary of each of the five bodies of water.

*Lake Malheur:* He found that the United States, before suit, had disposed of 79.80% of the total frontage of the upland bordering on the meander line of Lake Malheur and had retained upland fronting on the meander line to the extent of the remaining 20.20%. Of the 79.80% disposed of, 1.34% was school lands, granted to Oregon and sold by it to private grantees, and 4.80% was indemnity land, listed to and similarly sold by the State

before action was brought. The remaining 73.66% had been patented directly to private grantees. As none of the owners of these lands is a party to the present suit, the Master made no recommendation for a decree as to their interests in the land within the meander line.

*The Narrows:* As to Subdivision A, the Master found that the lands bordering on both sides comprised patented and indemnity lands which had been conveyed to individual owners, and that, as the Narrows is a non-navigable stream, the United States, by virtue of R. S. 2476, retained no interest in the land within the meander line, except insofar as it may have an easement through the entire Division for the flow of water from Lake Malheur.

*Mud Lake:* The Master found that the United States had retained no upland fronting on the meander line boundary. All except that now vested in Oregon, already referred to as having a frontage of 72.31 chains on the meander line boundary, is vested in private owners. Neither party has taken any exception to the findings, and as the private owners are not parties to the present suit, the Master made no recommendation for a decree with respect to their title or interest in the land within the meander boundary.

*The Sand Reef:* The Master found that the United States, at the commencement of the suit, had retained uplands having 84.92% of the total frontage on the meander line boundary of the Sand Reef. Of the frontage disposed of, 4.90% is that acquired by individuals and the remaining 10.18% is school land acquired by Oregon. The claim of the State that it has title to the adjacent lands within the meander line, as incident to its ownership of the upland, was rejected by the Special Master because the survey of the uplands was approved subsequent to the Executive Order of August 18, 1908, setting aside the area in question as the Lake Malheur Reservation. Although the State has excepted to this finding, because the Proclamation antedated the effective date of the Migra-

tory Bird Treaty Act, approved July 3, 1918, c. 128, 40 Stat. 755, we conclude that the Master's determination was correct. See *United States* v. *Midwest Oil Co.*, 236 U. S. 459, 469–475; *United States* v. *Morrison*, 240 U. S. 192, 210; see also the Act for the Protection of Game Birds of June 28, 1906, c. 3565, 34 Stat. 536.

*Harney Lake:* The Master found that at the time of commencement of the suit the United States had retained uplands bordering on 87.91% of the meander line boundary of Harney Lake and that it had disposed of lands having a frontage of 12.09%. Of this, 1.10% represents the frontage of land patented to a private individual. The remaining 10.99% represents frontage of school lands, of which those having a frontage of 5.87% were acquired by Oregon upon surveys approved after the Executive Order of August 18, 1908. For reasons already stated we conclude that the Master correctly determined that the State acquired no interest in the lands within the meander line upon this frontage, as incident to its ownership of the upland.

The Master found that the remaining school lands, having a frontage of 5.12%, passed to Oregon under a survey approved before the Executive Order, but he rejected the claim of Oregon to any interest in the adjacent land within the meander line. This was done because he thought the rule of *Hardin* v. *Jordan, supra,* was not applicable to school and indemnity lands surveyed to the border of non-navigable waters, and because the State had claimed and received lieu lands elsewhere for a deficiency in granted school lands, which deficiency lay within the meander line. We do not pass upon the first ground, but agree that the acceptance by the State of lands elsewhere, in lieu of lands lying within the meander line adjacent to the granted uplands, was such a practical construction of the boundary, and necessarily involved such a relinquishment of any interest in the

adjacent lands as an incident to the grant of uplands, as to preclude the assertion of that claim here.

The Master accordingly concluded that the United States retained the entire interest in the area within the meander line of Harney Lake, except such interest as was acquired by the individual patentee of upland. As he was not a party to the suit, the Master made no recommendation with respect to a decree as to his interest.

*Stable Lands within the Meander Line:* The Special Master found that there were stable lands, consisting of islands and promontories within the meander line, aggregating 9,327.8 acres at the mean water surface elevation of 4,093 feet above sea level, the title to which he found to be in the United States.[1]

The exceptions filed to the Master's report raise further issues with respect to the following findings, among others:

1. That the waters under which the lands in question lay were not navigable in fact on February 14, 1859, the date of admission of Oregon to statehood.

2. That there were on that date stable lands constituting islands and promontories within the meander line.

---

[1] Malheur Lake.

| | Acres |
|---|---|
| (a) Pelican Island | 840.0 |
| (b) Cole Island | 350.0 |
| (c) All other Islands | 4,921.6 |
| (d) Promontories | 1,880.0 |
| Total | 7,991.6 |
| The Narrows Islands | 21.2 |
| Mud Lake Islands | 88.0 |
| Sand Reef Islands | 1,227.0 |
| | 9,327.8 |

12

3. That the meander line as surveyed by J. H. Neal, 1895–1896, and approved in 1897, was and is a correct line.

4. That it is unnecessary to make any finding with respect to relicted lands within the meander line boundary, since such findings would affect only the title to upland owners not parties to the suit.

5. That the grants made by the United States to patentees of lands bordering upon the meander line boundary were comparable to those involved in *Hardin* v. *Jordan, supra.*

The State of Oregon has excepted to findings 1 and 2, and to the Master's failure to find that there were no relicted lands within the meander line boundary, and the United States has excepted to findings 3 and 5, its exceptions being intended to confine the decision to the issues between the United States and the State of Oregon and to eliminate consideration of questions affecting the rights of the upland patentee proprietors and settlers who are not parties to the suit.

In the view we take of the issues which are decisive of the present controversy between the United States and Oregon, it is unnecessary to determine the rights in the disputed area of the owners, other than Oregon, of uplands bordering on the meander line boundary, whether their claims are based upon reliction or the acquisition of an interest as an incident to the grants by the United States of uplands bordering the meander line. Nor is it necessary to determine whether any part of the meander line is correct upon which the lands of such upland owners border. As they are not parties, their rights cannot be affected by any decree to be entered in the present suit. *Priest* v. *Las Vegas,* 232 U. S. 604. Adjudication of their rights, as will be later pointed out, is not prerequisite to maintenance of the present suit or to entry of an appropriate decree.

It is also unnecessary to consider in detail the State's exceptions to the findings that there are stable lands within the disputed area. Even if such lands are not fast lands, because, as the State maintains, the mean surface water elevation is higher than 4,093 feet, as found by the Master, the claim of the United States that it has title to them will be controlled by our conclusions as to its title to lands within the meander line in which the Master has found the State to have no title or interest.

Neither the Government nor the State challenges the findings of the Master that Oregon has title to a part of the land lying within the meander line of Mud Lake, and to the land within the meander line boundary of Subdivision B of the Narrows. We accordingly accept those findings as correct. We have already resolved against the State the contentions that it has acquired and retains any right or interest, in the land lying within the meander line of any of the other divisions, as an incident to ownership of the uplands bordering on the meander line.

Such being the state of the case, the contentions of the State are reduced to three, which are those mainly relied upon in brief and argument. They are: (1) that the waters lying within the meander line boundary were and are navigable in fact. If not, it is then urged that the Government is impaled on one of the two horns of a dilemma: either (2) under the doctrine of *Hardin* v. *Jordan, supra,* title to the land underlying the water passed to the upland proprietors by virtue of the grants by the United States of uplands bordering on the meander line, in which case the United States, which must maintain its suit to quiet title by the strength of its own title rather than by the weakness of the defendant's, is not entitled to the relief which it seeks; or (3) the United States, by its conveyance of the uplands, has transferred to Oregon its title to adjacent lands within the meander line, by operation of the common and statute

law of the State, to which all conveyances of land within the State are subject.

We therefore pass directly to a consideration of these principal issues of the case.

## I. Navigability.

Dominion over navigable waters and property in the soil under them are so identified with the sovereign power of government that a presumption against their separation from sovereignty must be indulged, in construing either grants by the sovereign of the lands to be held in private ownership or transfer of sovereignty itself. See *Massachusetts* v. *New York*, 271 U. S. 65, 89. For that reason, upon the admission of a State to the Union, the title of the United States to lands underlying navigable waters within the States passes to it, as incident to the transfer to the State of local sovereignty, and is subject only to the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce. But if the waters are not navigable in fact, the title of the United States to land underlying them remains unaffected by the creation of the new State. See *United States* v. *Utah, supra,* 75; *Oklahoma* v. *Texas, supra,* 583, 591. Since the effect upon the title to such lands is the result of federal action in admitting a state to the Union, the question, whether the waters within the State under which the lands lie are navigable or non-navigable, is a federal, not a local one. It is, therefore, to be determined according to the law and usages recognized and applied in the federal courts, even though, as in the present case, the waters are not capable of use for navigation in interstate or foreign commerce. *United States* v. *Holt State Bank,* 270 U. S. 49, 55, 56; *United States* v. *Utah, supra,* 75; *Brewer-Elliott Oil Co.* v. *United States,* 260 U. S. 77, 87.

The Special Master based his conclusion that the waters within the meander line boundary were not navigable in fact on the date of the admission of Oregon to the Union, or afterward, on his finding of fact that:

"neither trade nor travel did then or at any time since has or could or can move over said Divisions, or any of them, in their natural or ordinary conditions according to the customary modes of trade or travel over water; nor was any of them on February 14, 1859, nor has any of them since been used or susceptible of being used in the natural or ordinary condition of any of them as permanent or other highways or channels for useful or other commerce."

It is not denied that this finding embodies the appropriate tests of navigability as laid down by the decisions of this Court. See *United States* v. *Holt State Bank, supra,* 56; *United States* v. *Utah, supra,* 76; *Brewer-Elliott Oil Co.* v. *United States, supra,* 86; *Oklahoma* v. *Texas, supra,* 586; *Economy Light & Power Co.* v. *United States,* 256 U. S. 113, 123; *United States* v. *Rio Grande Irrigation Co.,* 174 U. S. 690, 698; *The Daniel Ball,* 10 Wall. 557, 563. The only attack upon it is that it is not adequately supported by the evidence.

The finding, as the Master's report shows in detail, is rested upon his observations, made in the course of a personal inspection of the disputed area, and a careful consideration of the voluminous testimony of one hundred and forty-three witnesses. He made subsidiary findings with respect to (1) the physical condition, present and past, of the several bodies of water with respect to their depth, their channels or waterways capable of use in navigation, and the presence within them of vegetation, all of which affect their use and the access to them for purposes of navigation, and (2) their actual use, past and present, with special reference to (a) trapping of fur-bearing animals and (b) boating.

*Physical Condition:* The Special Master inspected Lake Malheur Reservation on or about November 1, 1931, accompanied by counsel and engineers representing the parties. He found that the entire area was then dry, and showed no signs in the soil of ever having been under water, except that water one to two inches in depth was found in Harney Lake, and about 400 acres in Lake Malheur was covered by water of negligible depth, and was surrounded by about 1,000 acres of mud. This 1,400 acre area lay in the more southerly part of the lake. The surface elevation above sea level of the 1,400 acres varied from 4,090 to 4,092 feet, which was below the average elevation of the meander line, fixed in the findings at 4,093 feet.

These data as to the condition of the area then, which are not directly challenged and are abundantly supported by the testimony, indicate clearly enough that all five divisions are shallow bodies of water which, with the exception of Lake Malheur, disappear completely or become negligible during a dry season. The five divisions are shown to lie in a flat plateau and their basins or beds to be so shallow and unprotected by banks that variations in the amount of water flowing into them produce large variations in the area covered by water, but relatively slight variations in depth. The entire area is shown to be an "evaporation pan" for the Harney County water basin, with an average annual evaporation of forty inches. The Master found that, except in years of abundant rainfall and favorable run-off, the water is not available to maintain an average water surface elevation of much above 4,093 feet.

Contour maps of Lake Malheur, where conditions admittedly are the most favorable for navigation, show that nearly half its area, with water surface standing at 4,093 feet, would be covered with water two feet or less in depth, and less than one-fourth of its area with water

between three and four feet in depth.[2] The areas which would be covered by water of depth sufficient to float boats are shown not to be continuous enough to afford channels or waterways capable of use in navigation. At a surface elevation of 4,093 feet the water is so shallow for long distances from the meander line as to preclude passage over it by boats, and with the water reduced to lower levels by seasonal evaporation the same area becomes mud or dry land. With a reduction of only one foot in water surface elevation, approximately 11,716 acres, otherwise covered by water, becomes mud or dry land, and other marked changes in the distribution of depths are produced. With the reduction in water surface attending the usual dry season of the summer, much of the area is made up of small lakes or ponds, separated by mud or dry land.

There has been no survey of Harney Lake, but contour maps of the other divisions show similar conditions, though less favorable to navigability. The evidence establishes that Harney Lake is even more shallow and is without banks on its westerly end. Its waters are alkaline, and almost without vegetation. Its water area at the time of trial was approximately 2,000 acres, having a depth of from one to two inches. The depths have been

---

[2] The evidence establishes the following data with respect to Lake Malheur with water surface at an elevation of 4,093 feet:

| | Acres |
|---|---|
| Lands under water of 1 foot, or less | 11,715.8 |
| Lands under between 1 and 2 feet | 10,126.6 |
| Lands under between 2 and 3 feet | 6,988.4 |
| Lands under between 3 and 4 feet | 10,821.2 |
| Lands under between 4 and 5 feet | 26.8 |
| Lands under water | 39,678.8 |
| Lands above water surface | 7,991.6 |
| Total | 47,670.4 |

18

variable, but the lake has not been shown at any time to have had a depth exceeding three feet. The evidence establishes that it has no stable or constant stand of water, and that large variations in the water area occur with seasonal and climatic changes.

All the other divisions are shown to be covered in substantial measure by tules, which ordinarily grow only in depths of five feet or less, and to be filled in the shallower portions with growths of vegetation of a character and extent such as to make navigation difficult, even though there were channels or waterways otherwise capable of use for that purpose. The presence of dead sagebrush and greasewood in all three lakes, in considerable areas generally covered by water, indicates that the land has been dry for substantial periods.

Scientific and historical evidence in great volume supports the conclusion that the physical condition of the bodies of water within the area has not varied substantially, so as to affect the possibility of their use in navigation, since the admission of Oregon to the Union. This is established by early maps and reports; a study of tree rings, indicating past climatic conditions, particularly the amount of annual rainfall; and the presence in all divisions, except Harney Lake, of underlying beds of peat varying from twelve to thirty inches in depth and tending to establish shallow water conditions, and the presence of vegetation, over a long period. The conclusion must be that at the time of admission to statehood the bodies of water within the meander line were shallow, with average surface water not much above 4,093 feet, with the water of all except Harney Lake substantially filled with tules and other types of water vegetation, so as to give them largely the character of swamps, with irregularly located but connected areas of shallow open water of variable depths.

The conclusion of the Special Master, that only under exceptional conditions does the water surface rise above 4,093 feet, is challenged by the State. The finding is based in part upon an elaborate study and report of water conditions in the Harney County water basin, prepared by Jessup, a Government engineer, showing that " in order to maintain a mean average elevation of this lake surface [Lake Malheur] much above 4,093 feet would require more water than has ever been available." In support of Oregon's exception to the Master's finding, it relies upon two independent private surveys, the results of which did not differ materially from those tendered by the Government, and the evidence of numerous witnesses who testified that at one time or another during the past 45 years they had seen the water at points which, if their estimates and recollections are correct, would establish a water surface elevation above 4,093 feet. Their testimony, aside from its often vague and untrustworthy character because based on estimates and unaided recollections over long periods of time, as well as that of the surveys referred to, tended at most to show that in exceptional conditions of flood the water surface rose somewhat above the elevation of the meander line. There is abundant scientific evidence, and the testimony of contemporary observers, that for considerable parts of each year, and except in unusual conditions of flood, the water falls substantially below that elevation. There is no convincing evidence that the Special Master erred in his conclusion that the mean water surface elevation is not much above that point.

The Master also found against the contention of Oregon, set up by its amended answer, that the water surface elevation had been materially lessened by diversion of water from the Silvies and Donner und Blitzen rivers, for purposes of irrigation. The record affords no sub-

20

stantial support for this contention. The voluminous scientific evidence must be accepted as establishing that any diversion, which could reasonably be assumed to take place by reason of irrigation, is too small in comparison with the area affected to produce any variation in depth of water sufficient to affect navigability. At a surface elevation of 4,092 feet the three lakes are connected and the flow of water required to raise water surface an additional foot, when allowance is made for increased evaporation, would considerably exceed any estimated amount of water artificially diverted.

Nor does the evidence support the contention of Oregon that the navigability of Lake Malheur and Mud Lake is affected by the breaking of a channel through the Sand Reef, and the resulting connection with Harney Lake, which is said materially to have lowered the surface of the waters in the two upper lakes. The Special Master found that the gap, about 45 feet wide, which was broken through the top of Sand Reef by flood water in 1881, has had no such effect. In this he is supported by the scientific evidence based upon the contour maps of the region, and the annual inflow of water into Lake Malheur, and the outflow through the Sand Reef to Harney Lake. There is no outflow in some years. The evidence shows that with the Sand Reef closed the depth of water in Malheur and Mud Lakes would be increased by only a few tenths of a foot.

*Trapping.* The State places much reliance on the large amount of testimony relating to the trapping of fur-bearing animals, principally muskrats, in the contested area. The evidence shows that, at times subsequent to 1890, a large number of animals were trapped in the tule areas, some in fall and spring, but principally in the winter months. Most of this evidence has no bearing on navigability, for with a few exceptions, the trappers appear

to have waded or walked. See *Toledo Liberal Shooting Co.* v. *Erie Shooting Club*, 90 Fed. 680, 682 (C. C. A. 6th). Before 1908 only three trappers are shown to have used boats. Later one trapper is shown to have used a rowboat and another to have used both a rowboat and a motor boat. Of the four witnesses who had used boats in connection with trapping, three referred to use of homemade boats of three or four to six inches draft, one in the fall of 1833 and following years, another in 1894–1895, and another subsequent to 1909. All wore gummed boots and found it necessary, in the use of the boats, to get out and pull them over shallow points in the lake where the depths were from one to four inches. Another, who used a boat in which he had installed a small motor, stated that the propeller sometimes struck bottom, when it would be necessary to pole the boat off, and that it was often stalled by the tangling of the " weedléss " propeller in the vegetation of the lake.

*Boating.* The Special Master found that the boating which took place in the area involved had no commercial aspects and was of such a character as to be no indication of navigability; that it was only such as might reasonably be expected to occur in a swampy area of the character and magnitude described. The issue of navigability was chiefly concerned with Lake Malheur, but the findings were made with respect to the entire area.

Numerous witnesses who had lived in the vicinity for many years had never used a boat and had never, or rarely, seen one on the lake. Most of the evidence of boating related to the use of boats by trappers, to which reference has already been made, and by duck hunters in the spring and fall of the year. The boats were all of light draft, those most in use being canvas canoes or homemade rowboats, drawing between one and six inches of water. The record is replete with evidence showing

that many difficulties were customarily encountered in the use of boats. It was usual to drag them many yards, sometimes several hundred, from the fast land before they would float. Once embarked they encountered tules, often six feet or more in height, and much other water vegetation, impenetrable at many points, but through which there was a labyrinth of channels leading to no definite or certain destination. Hunters, in many instances, found it necessary to flag or otherwise mark the course in order to insure a convenient and safe route for return. The boats were often propelled by poling them through the tules and over the shallow places, or by getting out and pulling them.

Only four motor boats appear ever to have been used, and then only to a very limited extent, when conditions were favorable, in the more open water in the southeasterly part of Lake Malheur. This could ordinarily be reached by motor boat only by passing through a considerable distance of relatively shallow water in the region of the Blitzen River. One operator of a motor boat was often marooned by shallow water and took with him a small canoe as a means of proceeding when the motor boat was grounded. He had never found the boat useful because of the weeds and the shallowness of the water. The others had the same difficulties. Two stated that they could only use the boats during high water in spring and early summer. One of them, the Reserve Protector, a resident since 1909, had patrolled Lake Malheur in his boat in high water, but the greater portion of his patrolling was not by boat. The fourth person who had used a motor boat had often found it necessary to get out and pull the boat over shoals in one to four inches of water.

The evidence of any use of boats in the other divisions was much more meagre and still less indicative of the possibility of navigation. There is a single instance of bringing a small quantity of hay by rowboat from one

of the small islands in Lake Malheur, but there is no other evidence of transportation of any commodity, beyond that already indicated.

The evidence, taken as a whole, clearly establishes the flat topography of the disputed area, the shallow water without defined banks, ice-bound from three to four months of the year, the separation of areas covered by water of sufficient depth to float boats, the presence of tules and other forms of water vegetation, a dry season every year, and frequent dry years during which Mud and Harney Lakes are almost entirely without water, and Lake Malheur is reduced to a relatively few acres of disconnected ponds surrounded by mud. These conditions preclude the use for navigation of the area in question, in its natural and ordinary condition, according to the customary modes of trade or travel over water, and establish an absence of that capacity for general and common usefulness for purposes of trade and commerce which is essential to navigability. See *United States* v. *Rio Grande Irrigation Co., supra,* 698. At most the evidence shows such an occasional use of boats, sporadic and ineffective, as has been observed on lakes, streams or ponds large enough to float a boat, but which nevertheless were held to lack navigable capacity. See *United States* v. *Rio Grande Irrigation Co., supra,* 699; *The Montello,* 20 Wall. 430, 442; *Leovy* v. *United States,* 177 U. S. 621, 627, 633; *North American Dredging Co.* v. *Mintzer,* 245 Fed. 297 (C. C. A. 9th); *Toledo Liberal Shooting Co.* v. *Erie Shooting Club, supra,* 682; *Harrison* v. *Fite,* 148 Fed. 781, 786 (C. C. A. 8th).

It is not without significance that the disputed area has been treated as non-navigable both by the Secretary of the Interior and the Oregon courts. The Secretary, in 19 L. D. 439, December 3, 1894, described Lake Malheur as " non-navigable," and in 16 L. D. 256, March 3, 1893, and in 30 L. D. 521, March 11, 1901, as " little more than

24

a swamp or marsh," and again as a " vast marsh or tule swamp with comparatively little open water." The Oregon Supreme Court, in cases involving the correctness of the present or previous meander lines, has repeatedly recognized that Lake Malheur is non-navigable. See *French-Glenn Live Stock Co.* v. *Springer,* 35 Ore. 312, 323; 58 Pac. 102 (1899), 185 U. S. 47, 53; *Cawlfield* v. *Smyth,* 69 Ore. 41, 42; 138 Pac. 227 (1914); *Bailey* v. *Malheur Irrigation Co.,* 36 Ore. 54, 55; 57 Pac. 910 (1899); *In re Rights to Use of Waters of Silvies River,* 115 Ore. 27, 34; 237 Pac. 322 (1925).

*II. Right of the United States to Maintain the Suit.*

Oregon contends that the State has never adopted the rule of *Hardin* v. *Jordan, supra,* and that in any case the rule has never been applied by this Court and, further, is not applicable to lakes the size of Malheur and Harney. See *Stewart* v. *Turney,* 237 N. Y. 117, 123; 142 N. E. 437; *Granger* v. *Canandaigua,* 257 N. Y. 126, 130; 177 N. E. 394; *Richardson* v. *Sims,* 118 Miss. 728; 80 So. 4; *Boardman* v. *Scott,* 102 Ga. 404, 406–419; 30 S. E. 982. But if applied, and the upland proprietors whose grants are bounded by the meander line are held to take to the center of the lakes, then it is insisted that the United States, which must prevail upon the strength of its own title rather than the weakness of that of the State, cannot maintain the present suit to quiet title with respect to any part of the beds of the lakes thus shown to belong to the upland proprietors.

A bill to quiet title may not be defeated by showing that the plaintiff's interest, otherwise sufficient to support the bill, is subject to possibly superior rights in third persons not parties to the suit. *Van Wyck* v. *Knevals,* 106 U. S. 360, 368, 369; *Lane* v. *Watts,* 234 U. S. 525, 541; 235 U. S. 17, 23; see also *Gridley* v. *Wynant,* 23 How. 500, 503; *Clipper Mining Co.* v. *Eli Mining & Land Co.,* 194

U. S. 220, 223, 234. It is enough that the interest asserted by the plaintiff in possession of land is superior to that of those who are parties defendant. Before Oregon was admitted to statehood, the United States is shown to have acquired title which it has never in terms conveyed away. Its possession and claim of title have ever since continued. The Executive Order setting aside the area in question as a bird reservation was an assertion of title and possession. Following the Order, as the Master found, the United States, through representatives of the Department of Agriculture, particularly a resident protector or warden, has taken active control of all the lands within the meander line. In the exercise of that control it has excluded hunters, erected posts marking the limits of the reservation, posted notices advising all persons of the existence of the reservation and warning them to refrain from hunting on it. This possession of the United States, under color and claim of title, is not shown to have been disputed or interfered with. As it is sufficient to preclude any action at law in the nature of ejectment, it is an adequate basis for relief in equity to remove the cloud created by the assertion of any inferior title of the State. *Wehrman* v. *Conklin,* 155 U. S. 314, 325; *Allen* v. *Hanks,* 136 U. S. 300, 311; see *Sharon* v. *Tucker,* 144 U. S. 533, 543–548; *Lancaster* v. *Kathleen Oil Co.,* 241 U. S. 551, 555. There is no course of legal procedure by which a title to land can be adjudicated as good against all the world. It is therefore unnecessary to determine whether the rule of *Hardin* v. *Jordan, supra,* applies to grants of upland fronting on Lake Malheur and Harney Lake, or what interests, if any, have been acquired in the disputed area by any of the upland owners, other than Oregon. The United States is entitled to relief so far as it is able to show that Oregon is without any right or title on the basis of which it would be entitled to disturb the possession of the United States.

*III. Oregon's Claim of Title to the Lake Beds in Consequence of Grants of Uplands by the United States.*

This claim is based upon the assumption, which for present purposes we also make, that the rule of *Hardin* v. *Jordan, supra,* does not obtain in Oregon, and that accordingly the ownership of upland proprietors does not extend within the meander line boundary, and also upon the statute of Oregon effective February 25, 1921, c. 280, Laws of 1921. This legislation declares that lakes within the State which have been meandered by United States surveys are navigable public waters of the State, and that " the title to the bed and land thereunder, including the shore or space between ordinary high and low water marks " not previously granted by the State " is hereby declared to be in the State of Oregon, and the State of Oregon hereby asserts and declares its sovereignty over the same and its ownership thereof." The contention is that, upon grant of the uplands by the United States, whether to the State or others, title to the adjacent lake beds vested in the State by operation of the statute.

It is insisted that after statehood local law controls the disposition of the title to lands retained by the United States underlying non-navigable waters within the State, and that the effect, upon the title to such lands, of the conveyances of the adjacent upland by the United States is to be determined by reference to state laws. In support of this proposition, reliance is placed upon language in the opinion in *Hardin* v. *Jordan, supra,* 381–384, which, however, refers in part to conveyances of uplands bounded on navigable waters (tide water), and upon the decisions of certain state courts applying the rule contended for to lands underlying non-navigable waters. See *Fuller* v. *Shed,* 161 Ill. 462, 494; 44 N. E. 286; *Hammond* v. *Shepard,* 186 Ill. 235, 241; 57 N. E. 867; *Wilton* v. *Van-Hessen,* 249 Ill. 182; 94 N. E. 134; *Iowa* v. *Jones,* 143

Iowa 398, 402; 122 N. W. 241; *Lamprey* v. *State*, 52 Minn. 181, 192; 53 N. W. 1139; *McBride* v. *Whitaker*, 65 Neb. 137, 154; 90 N. W. 966; *Ne-pee-Nauk Club* v. *Wilson*, 96 Wis. 290, 295; 71 N. W. 661; compare *Whitney* v. *Detroit Lumber Co.*, 78 Wis. 240, 246; 47 N. W. 425.

It is true, as was specifically pointed out in *Oklahoma* v. *Texas, supra,* 594, 595, that the disposition of such lands is a matter of the intention of the grantor, the United States, and " if its intention be not otherwise shown it will be taken to have assented that its conveyance should be construed and given effect in this particular according to the law of the state in which the land lies." This was the effect of the decisions in *Hardin* v. *Jordan, supra; Mitchell* v. *Smale,* 140 U. S. 406; and *Kean* v. *Calumet Canal Co.,* 190 U. S. 452, in which conveyances bounded upon the waters of a non-navigable lake were, when construed in accordance with local law, held impliedly to convey to the middle of the lake.

The rule that title to lands underlying navigable waters presumptively passes to the State upon admission to the Union has already been noted. *Massachusetts* v. *New York, supra,* 89; see *Scott* v. *Lattig, supra,* 242, 243. But in no case has this Court held that a state could deprive the United States of its title to land under non-navigable waters without its consent, or that a grant of uplands to private individuals, which does not in terms or by implication include the adjacent land under water, nevertheless operates to pass it to the State. Whether, on any theory, such a result could be upheld was a question expressly reserved in *Hardin* v. *Shedd,* 190 U. S. 508, 519; *Whitaker* v. *McBride,* 197 U. S. 510, 515; *Marshall Dental Co.* v. *Iowa,* 226 U. S. 460, 462. In none of these cases were the parties necessary for the determination of that question before the Court.

The laws of the United States alone control the disposition of title to its lands. The States are powerless to place

28

any limitation or restriction on that control. *Wilcox* v. *Jackson*, 13 Pet. 498, 516, 517; *Gibson* v. *Chouteau*, 13 Wall. 92, 99; see *Brewer-Elliott Oil Co.* v. *United States, supra*, 88; *United States* v. *Utah, supra*, 75. The construction of grants by the United States is a federal not a state question, *Packer* v. *Bird*, 137 U. S. 661, 669, 670; *French-Glenn Live Stock Co.* v. *Springer*, 185 U. S. 47, 54; *Chapman & Dewey Lumber Co.* v. *St. Francis Levee District*, 232 U. S. 186, 196, and involves the consideration of state questions only insofar as it may be determined as a matter of federal law that the United States has impliedly adopted and assented to a state rule of construction as applicable to its conveyances. See *Oklahoma* v. *Texas, supra*, 594, 595; *Utah Power & Light Co.* v. *United States*, 243 U. S. 389, 404. In construing a conveyance by the United States of land within a State, the settled and reasonable rule of construction of the State affords an obvious guide in determining what impliedly passes to the grantee as an incident to land expressly granted. But no such question is presented here, for there is no basis for implying any intention to convey title to the State.

The State, in making its present contention, does not claim as a grantee designated or named in any grant of the United States. It points to no rule ever recognized or declared by the courts of the State that a grant to individual upland proprietors impliedly grants to the State the adjacent land under water.[3] The only support for its claim is the statute of 1921, adopted subsequent to

---

[3] By § 63-102, Oregon Code Annotated, 1930, enacted in 1862, and by judicial decision, *Micelli* v. *Andrus*, 61 Ore. 78, 85, conveyances of upland bounded upon non-navigable streams carry to the middle or thread of the stream.

every grant of the United States involved in the present case. The case is not one of the reasonable construction of grants of the United States, but the attempted forfeiture to the State by legislative fiat of lands which, so far as they have not passed to the individual upland proprietors, remain the property of the United States. Such action by the State can no more affect the title of the United States than can the similar legislative pronouncements that streams within a State are navigable which this Court has found to be non-navigable. See *Oklahoma* v. *Texas, supra; United States* v. *Utah, supra,* 75; *United States* v. *Holt State Bank, supra,* 55, 56.

The Master correctly found that there were no facts or circumstances to establish, as matter of fact, any intent on the part of the United States to abandon or surrender its claim to any part of the area within the meander line.

We accordingly accept the findings and determination of the Special Master, to which the Government does not except, as to the title and interest of the State of Oregon in Mud Lake and in Division B of the Narrows, and conclude that the State has no right, title or interest in any part of the remainder of the area, which is superior to that of the United States. The United States is entitled to a decree in conformity with this opinion, and also with the decree recommended by the Special Master so far as it is not inconsistent with this opinion, quieting its title and possession, as against the State of Oregon, to such remaining area within the meander line boundary of the five divisions.

The parties, or either of them, if so advised, may, within thirty days, submit the form of decree to carry this opinion into effect, failing which the Court will prepare and enter the decree.

*It is so ordered.*