**STOUTAMIRE, et al v. PARRAMORE, et ux.**
No. 16580.
Circuit Court, Leon County.

August 2, 1965.

Charlton L. Pierce, Tallahassee, for plaintiffs.

Robert M. Ervin of Ervin, Pennington, Varn & Jacobs, Tallahassee, for defendants.

BEN C. WILLIS, Circuit Judge.

*Supplementary final decree:* This cause came on for further consideration by the court on the pleadings and evidence and argument of counsel having been heard, and the court being fully advised, it is further ordered, adjudged and decreed —

(1) The remaining issue to be resolved is the ownership of a strip lying between the line of an old fence (and as it would be extended) and the east line of the paper boundaries of lands to which the plaintiffs have color of title, in Section 15, Tp 1S, R 4W. The plaintiffs have color of title, derived from several sources and at different times, to lands in this section which purport to set the eastern boundary at the west boundary of the E½ of the SE¼ and the west boundary of the E¼ of the W½ of the NE¼. This would thus consist of a line running north for a half mile from the SW corner of the E½ of the SE¼, and then it would effect a jog westward 330 feet and run thence due north to the waters of Lake Talquin.

(2) The plaintiffs claim this by virtue of adverse possession under color of title together with the operation of various statutes of limitations and repose, and superior title otherwise. The defendants claim to have record title arising out of a deed, dated February 11, 1860, recorded May 29, 1870 in Deed Book "P" page 298, from John Beard, Receiver, to Green B. Hopkins, which purports to convey "the remainder not heretofore sold" in said Section 15. The grantor in this deed was the receiver in court proceedings involving the Apalachicola Land Company, which had acquired the "Forbes Purchase" including this Section 15. This deed appears to have been the earliest record conveyance of lands in Section 15. This deed purports to convey also the "remainder not heretofore sold" of the lands in Sections 10, 11 and 14 of Tp 1S, R 4W. It recites the area to consist of 1,205 acres. The defendants also claim adverse possession and superior title otherwise.

(3) The deed to Green B. Hopkins is thus obviously not adequate in and of itself to identify the lands actually conveyed. Its clear intent is to vest in the grantee such lands in the named sections which the grantor, or his predecessors in title, had not previously "sold". What would be embraced within the term

"sold" is also not free from ambiguity, as this might be construed as sales evidenced by record conveyances or sales evidenced by executed and delivered deeds not necessarily recorded, or sales evidenced by contracts of sale and purchase, or even informal and unenforceable agreements of sale which the grantor would deem to constitute a commitment.

(4) The pole star of construction of an ambiguous deed is the intention of the parties and this may be ascertained by a consideration of all of the circumstances at the time and also subsequent events which may shed light on the intentions. It is at once obvious that the intent of the parties in a transaction more than 100 years ago is not susceptible to contemporary testimony. The court is thus largely forced to rely upon evidences of the actions of involved persons who probably were influenced by the expressed and understood intentions of the parties.

(5) The court may take judicial notice of well known and accepted historical facts, even though such are closely localized. It is well known to the bench and bar of this circuit, which has regularly been confronted with the legal implications of the "Forbes Purchase", of the vesting of title to these lands in the Apalachicola Land Company, the receivership of this company, the appointment of John Beard as receiver, and the extent of his dispositions of the company lands. Most of the essential facts are documented by court records and recorded instruments. However, it is also well known that during this period it was a frequent occurrence that fully executed and delivered deeds would not be brought to the clerk for recording. The country was sparsely settled, exact boundaries of lands were not usually regarded as important, many of the settlers were uninformed of the desirability of recording and some did not deem it worth the expense. Generally a land owner knew his approximate boundaries, also well knew his neighbors and what their holdings were. With that background it is logical to turn to the evidences of what the predecessors in their chain of title seem to have regarded as theirs.

(6) The recorded conveyances down to the death of Green B. Hopkins are not helpful in identifying the extent of his holdings, except that he executed some conveyances to lands in the section which are not involved in the issues now under consideration. Also there are some deeds out of Beard to lands in the section not presently involved. One Simon Ulmer is shown to have

acquired several parcels of Section 15 land and out of his estate there was issued in 1878 a commissioner's deed, in partition proceedings among the heirs, to one William Dennyx, which constitutes the first of a chain which casts on the plaintiffs color of title to a large part of the area in question. As early as 1880, the tract which Dennyx purported to have acquired was the subject of a deed to Daniel Stoutamire, an ancestor of plaintiff J. J. Stoutamire. Through the chain of this and subsequent muniments of title, the plaintiffs acquired whatever interest Dennyx had. These particular instruments purport to embrace an area which would place its eastern boundary on a line which would coincide with that claimed by the plaintiffs in this suit, but it only extends to the southeast corner of the NW¼ of the SE¼. In brief the eastern boundary of the Dennyx tract (1878) is: the east boundary of the NW¼ of the SE¼ and east boundary of the W¾ of W½ of NE¼.

(7) At sometime prior to March 7, 1887 Green B. Hopkins died leaving some ten heirs, one of whom was William H. Hopkins. In proceedings in his estate there was a petition by William H. Hopkins, as administrator of his father's estate, "to sell all the real estate belonging to the estate of said deceased", situated in Leon County. It then described such lands and, with reference to Section 15, set forth only the E½ of NE¼ and E½ of SE¼. This petition was followed by an order directing the sale of the same described land, the conduct of a public sale pursuant to notice, report of the appointed commissioner that sale had been made to William H. Hopkins, and an order confirming the sale and directing issuance of deed to vest title in this purchaser upon compliance with the terms of sale. No deed of record has been exhibited, but for the purposes of this case it may be assumed that William H. Hopkins did thus acquire the title to the E½ of E½ of Section 15. The evidence shows that he lived upon and occupied lands, of which this area in Section 15 (E½ of E½) would be a part, until his death in 1938.

(8) A conveyance from J. D. Stoutamire to plaintiff J. J. Stoutamire executed and recorded in 1916 purported to convey lands which would indicate an eastern boundary coinciding with the east boundary of W½ of SE¼. The tract thus described was a right angle triangle with the base consisting of the east boundary of W½ of SE¼ and the hypotenuse as a diagonal line running from NW¼ of SW¼ of Section 15 to the southeast corner of SW¼ of SE¼.

(9) The Dennyx tract (1878) and the J. D. Stoutamire tract (1916) thus serve to give paper color of title evidence to define the eastern boundary of the lands claimed by the plaintiffs. The other instruments giving color of title, namely the Coe deeds (1904-1907), and the second J. D. Stoutamire deed (1943) and subsequent consistent instruments, supply two small wedges which would fill out color of title to the lands involved, but since it is only the point of each of the wedges which touches the boundary contended for, these instruments add nothing to boundary definitions except to show that they are consistent with such boundary.

(10) Taking into account the boundary as would be shown by the evidences of plaintiffs' color of title and the boundary of the lands shown to have been in Green B. Hopkins' estate, as aforementioned, it is shown that in the south half of the section they coincide. In the north half of the section, the two boundaries would not coincide but rather than overlap would leave a hiatus of 330 feet between parallel lines.

(11) In 1938 William H. Hopkins died intestate leaving as his heirs the defendant Willie Hopkins Parramore, her sister, Mrs. Cassie Hopkins Wainwright, and his widow. The widow subsequently died. In 1951, a partition suit between Mrs. Parramore and Mrs. Wainwright resulted in an allotment in kind of certain lands which were found to be owned by these persons in undivided interests. It is not important to discuss the extent of the undivided interests as between these sisters, but it appears the case proceeded on the establishment of two-thirds interest in the lands in Section 15 (and adjacent) in Mrs. Parramore and one-third in Mrs. Wainwright. The property described as being involved shows a tract which extends into the eastern portion of Section 15 with a western boundary (south of Lake Talquin) which would coincide precisely with that which the plaintiffs' color of title would define. These lands in Section 15, with other lands adjacent, were allotted to Mrs. Parramore. The commissioners' report was rendered in February, 1952. It appears clear the lands involved in this partition were all the lands in Leon County which were claimed to have been part of the estate of William H. Hopkins.

(12) To this point, it is shown that the paper evidences of the boundary between the lands of the plaintiffs and those of the defendants are consistent with one another, and rather strongly show that there has not been any real dispute between the owners

of the adjoining lands as to what the paper boundary is. The dispute is where the actual boundary lies on the ground. The plaintiffs contend that the paper boundary as would be shown by an actual survey is the actual boundary, whereas the defendants contend the actual boundary is an old fence line which runs 330-350 feet west of the paper boundary in the south half of the section and about 75 feet west of the paper boundary in the north half of the section. They claim boundary by acquiescence, adverse possession, as well as superior record title.

(13) The fence involved was composed of woven wire on lightwood pine posts which, in 1957, extended from the shores of Lake Talquin south about 1,350 feet, which would be about 750 feet north of State Road 20 (which crosses the south half of Section 15). As late as 1938 and perhaps sometime later, the fence extended almost to the state road. It is a very old fence, but was not maintained to any extent for a number of years. The evidence shows that it was once part of an enclosure for a field and also for a pasture. Cultivation and confinement of livestock, when the lands were used by plaintiff Stoutamire and his predecessors for agriculture, seems to have been confined to areas west of the fence.

(14) The Stoutamires and the Hopkins for many years, commencing long prior to the turn of the century, were adjoining neighbors and friends. Their dwellings were well back from the common boundary, wherever it may have been. The area now disputed does not appear to have ever been put to any significant use by anyone prior to certain timber cutting by the Parramores which has precipitated this and related lawsuits. Such uses as had been made of this area were intermittent, desultory and unsubstantial. No survey of the paper boundary was ever made. It appears that neither of the adjoining owners really knew or particularly cared where the exact boundary may have been.

(15) About 1952 the defendant Parramore caused a survey to be made by a Mr. Shelfer, who actually did run a line. However, this survey is not shown to have been anything more than an extension of the fence line, from its southern extremity to the south section line. This surveyed line extended into the area south of State Road 20. It is clear there never was any fence south of the road.

(16) There is also evidence that the plaintiff J. J. Stoutamire had regarded the fence as being on or near the boundary. It

may be that some of his statements, particularly with reference to the cutting of timber in 1952, could be the basis of estoppel or waiver of the right to demand damages for such timber cutting. However, that issue is not before the court in this case and is mentioned only to point out that determination of ownership of the land does not necessarily determine liability for trespass.

(17) The evidence is in great conflict as to acts and statements of the plaintiff Ide W. Blount with reference to the status of the fence as the boundary and his acquiescence in the timber cutting. Again this may be a critical issue in a trespass action, but is not necessarily determinative of title. In any event it does not appear that the acts, statements, or circumstances of the parties and their predecessors in title establish the fence line as a boundary by acquiescence. Except for the cutting of timber in 1952 for defendants by Mr. Hannon, it is not shown that the defendants or their predecessors in title have made improvements or otherwise acted in reliance on the fence as a boundary in any material manner. Even if all parties did think the fence was the boundary, a fact not necessary to decide, this would not establish a boundary different from that shown by proper survey of the true paper boundary.

(18) To constitute the establishment of a boundary by acquiescence there must be (1) uncertainty or dispute as to location of the true line, (2) location of the boundary by the parties, and (3) acquiescence in such location for the prescriptive period. Shaw v. Williams (Fla. 1950), 50 So. 2d 125. There may have been uncertainty as to the location of the line in that no survey was made of same, but not until 1952 has there been any dispute. It is not shown that there has been any acquiescence in any agreed upon established line for the prescriptive period.

(19) As already noted there has not been such adverse and exclusive possession on the part of the defendants or their predecessors as would ripen into title.

(20) Thus we revert to the paper evidences of ownership and their legal effect. As has been stated, the plaintiffs have color of title to the area of the disputed lands in the form of conveyances of record of which the most recent was recorded February 22, 1943. The other recorded instruments giving color of title have been recorded since, as early as 1878 and as late as 1916. Since their recording there has not been made of record any

instrument by the defendants or others which has "asserted . . . an adverse claim" until the recording in 1956 of two quit claim deeds, one from Lola Hopkins Gregg and the other from Mrs. Bessie Thorne to the defendant Willie Hopkins Parramore which purported to quit-claim all of Sections 10, 11, 14 and 15, Tp 1S, R 4W. These deeds will be mentioned further, but it is shown that there have been on record deeds for about 40 years which purport to convey into the plaintiffs' chain of title all of the disputed lands which are now involved in this order, except for a small wedge at the extreme south end. As to these conveyances and the lands they purport to convey it appears that F. S. 95.23 is fully applicable and operates to bar any claim of defendants to said lands and also operates to render such deeds valid and effectual for conveying such lands therein described as against all persons including the defendants. As to the small wedge which was included in the 1943 color of title deed, it is to be observed that in this deed the grantor purported to convey several parcels of land, some of which may have been imperfectly described. However, the wedge involved here is part of SW¼ of SE¼ of Section 15, which "forty" is specifically described. Also this deed purports to convey other adequately described lands contiguous to the SW¼ of SE¼ which merged it in with other contiguous lands to make it part of the undoubted farm and homeland of plaintiff J. J. Stoutamire. However, the evidence does not show that the tract of which this wedge is a part and which is described in the 1943 deed was actually occupied and used to the extent of constituting adverse possession for the prescriptive period of seven years. Also, the possession of the entire farm and timber holdings under previous deeds cannot serve to give constructive adverse possession to this portion. Therefore it cannot be concluded that the small (less than 2 acres) triangle at the extreme south end of the strip in dispute has been vested in the plaintiffs by either record title, adverse possession, or operation of statutes of repose.

(21) This finding does not, however, have the effect of declaring that the defendants have title to this triangle. There is nothing to indicate that Green B. Hopkins or his immediate successor William H. Hopkins ever asserted any claim or pretense to own this particular area of the strip. All of the inferences are to the contrary. Green B. Hopkins in 1879 conveyed to William Dennyx a tract of 106 acres which, though somewhat vague, seemed to

convey land adjacent to and west of the area of this particular triangle. Rather than conclude that he claimed to own the area embracing this triangle and retained it rather than convey it to Dennyx, it is equally if not more inferable that he did not own it. The latter inference is consistent with proceedings in the Green Hopkins estate which did not include this area in what purported to be a list of all of his lands. It is thus concluded that the 1860 deed from Beard to Green B. Hopkins did not embrace within its terms and effect a conveyance of the particular area covered by the said triangle.

(22) As between the plaintiffs Stoutamire and the defendants, it thus appears that the said plaintiffs have color of title to this wedge under the 1943 deed from J. D. Stoutamire and thus have constructive possession of same while the defendants do not have color of title. This circumstance gives the plaintiffs superior possessory rights to the land, but they may not have a decree declaring them to be the indefeasible fee simple owners against "any and all persons having or claiming any right, title or interest" in and to the said triangle, because they have not shown title deraigned from its ultimate source, by adverse possession, or from a common source with defendants, or from the defendants. McDaniel v. McElvery, 91 Fla. 770, 108 So. 820; Rabinowitz v. Houk, 100 Fla. 44, 129 So. 501. However, to quiet title against the claims of defendants and to remove their claims as clouds, it is only necessary to show that the interest asserted by the plaintiffs is superior to that of the defendant parties. 27 Fla. Jur. 27 (Quieting Title, §26) ; 44 Am. Jur. 39 (Quieting Title, §50) ; United States v. Oregon, 295 U.S. 1, 79 L. Ed. 1267, 55 S. Ct. 610.

(23) The defendants have asserted some rights under two quit claims deeds, executed in 1956, each of which purports to quit-claim to the defendant Willie Hopkins Parramore "all of Sections 10, 11, 14 and 15, Township 1 South, Range 4 West." Each deed bears a 10¢ state documentary stamp, evidencing a consideration of not more than $100. Both were recorded in 1956 (Deed Book 201 p. 289 from Mrs. Thorne and Deed Book 205 p. 310 from Mrs. Gregg). The grantors are heirs and descendants of Green B. Hopkins. Presumably their claim of title was based on some concept that Green B. Hopkins' interests, outstanding at his death, had never become vested in anyone other than his heirs by operation of the laws of descent and distribution. These deeds, insofar as all of the lands now being

considered are concerned, are ineffective and to the extent that they purport to create any interest in these lands in favor of the grantee they are null, void and removable as a cloud on the title. The grantors had no title and therefore their quit-claim was an empty gesture, but their presence on the record is a cloud on the plaintiffs' title which equity requires be removed.

(24) By an amendment to the complaint, the plaintiffs Blount have asserted a claim to certain lands in Section 15 lying in the W½ of NE¼ which were the subject of a conveyance by Green B. Hopkins to Simon V. Ulmer in 1862 (not recorded until 1959 in DB 250, p. 376). It is claimed that this deed aids in defining the "Hopkins line" as that term is used in some of the deeds under which the Blounts claim and would indicate such line to be east of the lands claimed by plaintiffs in the original complaint. Rather than extend the length of this opinion and decree by detailed discussion, it would seem sufficient to say that the descriptions in the deed are so vague as to be uncertain of meaning, and, further, there has been nothing in the records shown or the evidence to indicate any basis to any title in the plaintiffs to any of the lands in Section 15 east of that which the paper boundaries clearly assert in the muniments of their chain of title. The claims set forth in the amendment to the complaint are denied.

(25) Accordingly, in view of the foregoing findings of fact and conclusions of law, it is further ordered, adjudged and decreed that —

A. The plaintiffs and their successors and assigns, including those holding, under, by and through them and each of them, according to their respective interests, be and the same are hereby declared to own, hold and be vested with the fee simple title in and to —

> All that portion of W¾ of W½ of NE¼; and W½ of SE¼ of Section 15, Tp. 1S, R 4W, as lies east of a certain fence line and an extension or projection thereof situate approximately 330 to 350 feet west of the west line of the E¼ of said Section 15 (see line marked by green crayon "X" marks and initials B.C.W. on Exhibit A attached to partial final decree in this cause dated February 22, 1961), EXCEPT the following:
>
>> Begin at the SE corner of SW¼ of SE¼ of said Section 15, proceed west 330 feet, more or less, to the projection of the fence line above mentioned, then run north along said fence line 220 feet, and thence southeasterly 396.6

feet, more or less, to the point of beginning; the said EXCEPTION being the wedge or triangle in the extreme south end of the lands under consideration in this decree and to which plaintiffs have color of title dating only since February 22, 1943 by deed recorded in Deed Book 50 p. 517 of Leon County records; END OF EXCEPTION:

and, all claims of the defendants in and to the said lands be and the same are held for naught and are removed as clouds on the said title of the plaintiffs and their said grantees and successors in title; and the said defendants be and the same are hereby enjoined, and restrained from asserting or claiming any right, title, or interest in and to said lands in dispute of or adverse to the said title of said plaintiffs and their said grantees and successors.

B. The lands constituting the triangle in the south end of the lands under consideration in this decree, the same being set forth in the *exception* to the lands described in paragraph A above, be and the same are found to be in the constructive possession of the plaintiff Jessie J. Stoutamire, pursuant to the aforementioned deed recorded in Deed Book 50, p. 517, which deed constitutes bona fide color of title to said triangle dating from February 22, 1943 and under such the said plaintiff is vested with a fee simple title and interest to said triangle of land superior to any claim or apparent claim of the defendants, and such claim or apparent claims of the defendants in said triangle be and the same are found to be clouds on the said superior title of plaintiffs and the same are hereby held for naught and removed.

C. The claims of the plaintiffs Blount, asserted in the amendment to the complaint, to lands other than those already dealt with in this decree, and that of February 22, 1961, as corrected by order filed March 21, 1961, be and the same are denied and said amendment to the complaint is dismissed.

D. Nothing herein shall be construed as adjudicating any estoppel, waiver, or other similar defense which is or may be pertinent to those certain law actions pending in this court (no. 6711 and no. 6844) between the same parties as are in this cause. This cause is confined to determination of title to the lands in dispute and not any additional issues which may be involved in an action for trespass.

E. All prayers not herein granted or granted in other prior decrees in this cause are denied.